**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

————————————

No. 95-20969

————————————


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

VERSUS

RANDALL LEROY MYERS,

                                        Defendant-Appellant.


————————————————

Appeal from the United States District Court
for the Southern District of Texas

————————————————

January 14, 1997

Before HIGGINBOTHAM, SMITH, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


Randall Myers appeals his conviction of, and sentence for, three counts of interstate transmission of threatening communications. We affirm the conviction but remand for resentencing.


I.

Myers is a Vietnam veteran with a history of mental illness. In 1981, he was diagnosed with Post-Traumatic Stress Disorder ("PTSD") and classified by the Veterans Administration as 100% disabled. He also suffers from bipolar or "manic-depressive" disorder, for which he has been prescribed lithium, and diabetes,

for which he takes injections of insulin. As he readily concedes, failure to take his medication sometimes leads him to become easily agitated.

In March 1995, Myers's wife discovered a lump in her breast that she feared might be cancerous. When Myers inquired with the Veterans Administration about medical coverage for the tests and treatment she would need, he discovered that his benefits required him to pay a $150 deductible and covered only 75% of his wife's expenses beyond that amount. Unable to afford the copayment, Myers became convinced that his disabled veteran status entitled his wife to full coverage of her medical expenses.

Myers first attempted to negotiate this full coverage by calling the toll-free number for CHAMPVA, the organization administering his health benefits. After repeatedly failing to get through to CHAMPVA, however, he turned his attention to his congressman, William Archer. Myers phoned Archer's Washington, D.C., office from his Houston residence and spoke with Andrew Shore, a member of Archer's staff. Shore agreed to contact CHAMPVA on Myers's behalf but was unable to obtain the coverage Myers wanted.[1]

On March 22, 1995, Myers became dissatisfied with the response he was getting from Archer's office and telephoned Shore again. According to Shore, Myers was extremely emotional during this conversation, at various points crying, screaming, and yelling.

---

[1] This was not the first time Myers had spoken with Shore. At trial, Shore testified that they had had between 14 and 16 conversations in the six months prior to March 1995, most of which concerned veterans' affairs.

Myers told Shore that if his wife died, he "would take matters into his own hands" and that Shore "should be sure to have plenty of body bags around."  As one might expect, these statements caused Archer's staff serious concern.  The office contacted the FBI, which installed a recording device on Shore's phone.

On March 24, Myers called again.  This time the entire conversation was recorded, including the following exchange:

> Shore: The other day[,] Randy, you talked about body bags and ...
>
> Myers: Right and ...
>
> Shore: ... And not being ...
>
> Myers: ... And I'm still talking about body bags because if you do nothing what do you expect.
>
> Shore: I don't, what should I expect?
>
> Myers: I am going to get retribution for my and my family's suffering.  You can take that to the bank.
>
> Shore: What does that mean?  I mean what do you ...
>
> Myers: What it means, I'll do what, ah, like we said in Nam, whatever it takes.

Later in the conversation, Myers told Shore that he had a friend in Seattle who had TOW missiles, and spoke of "coming up there to die."

On April 7, Myers made a call to Carole Carrick, an employee of the Washington, D.C., office of the Paralyzed Veterans of America.  Carrick took notes of the conversation and testified at trial that Myers sounded "angry" and had spoken to her in "a very loud voice."  According to Carrick, Myers threatened the "VA and

3

Congress with damage severe enough to make the explosion in the World Trade Center look like a picnic," and announced his intention to confront Archer on videotape.  Myers also told Carrick that he was "head of the militia in this area" and made reference to AK-47 rifles being shoved into the faces of congressmen.  Understandably concerned, Carrick informed Archer's office of the conversation.

A grand jury indicted Myers on three counts of interstate transmission of threatening communications in violation of 18 U.S.C. § 875(c).  Count one stemmed from his statements to Shore on March 22 to the effect that if his wife died, Shore "should be sure to have plenty of body bags around."  Count two stemmed from the references during the March 24 conversation to "body bags" and doing "whatever it takes" to get even with the government.  Count three stemmed from his statements to Carrick on April 7 that he would cause the VA and Congress sufficient damage "to make the explosion in the World Trade Center look like a picnic."

A jury found Myers guilty on all three counts.  He was sentenced to two concurrent twelve-month prison terms and to three three-year terms of supervised release, two of them concurrent and the third consecutive to the other two.

II.

Myers's first claim is that there was insufficient evidence as to all three counts of his conviction because the government failed to prove that he made the threats voluntarily.  He argues that evidence of his psychological problems demonstrated that he was

4

unable to control his actions, which in turn compels the conclusion that he acted involuntarily.

We review *de novo* the denials of Myers's motions for judgment of acquittal. *United States v. Sanchez*, 961 F.2d 1169, 1179 (5th Cir.), *cert. denied*, 506 U.S. 918 (1992). We will affirm the jury's verdict if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict. *United States v. Lewis*, 92 F.3d 1371, 1380-81 (5th Cir. 1996), *petition for cert. filed* (U.S. Dec. 16, 1996) (No. 96-7151); *United States v. Gaytan*, 74 F.3d 545, 555 (5th Cir.), *cert. denied*, 117 S. Ct. 77 (1996). Our review of the sufficiency of the evidence does not include a review of the weight of the evidence or of the credibility of the witnesses. *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993). Moreover, the evidence "need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir.), *cert. denied*, 116 S. Ct. 1867 (1996).

Title 18 U.S.C. § 875(c) provides that "[w]hoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both." In this circuit, § 875(c) "requires proof that the threat was made knowingly and intentionally."

5

*United States v. Bozeman*, 495 F.2d 508, 510 (5th Cir. 1974), *cert. denied*, 422 U.S. 1044 (1975).  Pursuant to the Fifth Circuit Pattern Jury Instructions, the district court charged the jury that an act is done "knowingly" when it is done voluntarily and intentionally, and not because of mistake or accident.

Our review of the record leads us to conclude that the government did present sufficient evidence to establish that Myers made his threats voluntarily.  Two experts, Dr. Archie Blackburn and Dr. Seth Silverman, testified that Myers consciously chose to stop taking his medication during the time that he made the threats.  This alone could have allowed the jury to conclude that he acted voluntarily, for if he knew that discontinuing his medication might lead to such behavior and consciously chose to do so anyway, his resulting actions could not be characterized as involuntary.  To be sure, Myers presented expert testimony that his statements were involuntary.  None of the experts was present during any of Myers's phone calls, however, and it was squarely within the province of the jury to weigh their testimony accordingly.

The jury could also have inferred voluntariness from the tone and content of Myers's conversations with Shore and Carrick. Numerous remarks during those conversations indicate that Myers was aware both of himself and of his actions:  When talking to Shore, for example, he offered to be "civil" if allowed to speak with Archer; with Carrick, he gave considered responses to some of her questions.  A rational trier of fact could have found that the

evidence established voluntariness beyond a reasonable doubt.

III.

In a separate insufficient evidence argument, Myers contends that count two was what he calls a "cheap shot," because it was Shore rather than Myers who initiated talk of "body bags" during the March 24 conversation. Specifically, Myers contends that any threatening statements he made on March 24 were simply reiterations of his March 22 statements and that he was prompted by Shore to repeat these threats. Because of this, he argues, count two is completely duplicative of count one.

This argument is meritless. In this circuit, a communication is a threat under § 875(c) if "in its context [it] would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *Bozeman*, 495 F.2d at 510 (citations and internal quotations omitted). The evidence was more than sufficient to show that the March 24 statements met this test.

A communication does not lose its status as a § 875(c) threat merely by virtue of the defendant's having previously uttered similar words. For us to hold otherwise, as Myers urges, would effectively give people free license to recycle threats after their initial communication. That is not the law in any circuit, and we decline so to hold.[2]

---

[2] Myers appears to suggest that his conviction on count two violated his double jeopardy rights. Beyond the bare assertion in his appellate brief that he "basically has been convicted twice for the same offense," however, Myers has neither briefed nor otherwise presented any discussion on this point, and nothing

(continued...)

IV.

Myers next contends that he was unfairly prejudiced by Carole Carrick's testimony regarding his involvement in a militia group. Without objection from the defense, Carrick testified that Myers told her he was "the head of the militia in this area and there are other militias all over the country and you're going to very soon start seeing them taken actions that are really going to be serious." As a threshold matter, Myers asserts that these statements were not relevant to any of the issues before the jury. Moreover, he argues, because his trial occurred a short time after the April 1995 bombing of the Oklahoma City federal building, it was unfairly prejudicial and thus plainly erroneous for the district court to have admitted them.

As Myers concedes, his failure to object to this testimony at trial means that he must show plain error. *See* FED. R. CRIM. P. 52(b). Under the plain error standard, we correct forfeited errors only if (1) there was error, (2) the error was plain, and (3) it affected the defendant's substantial rights. *United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc), *cert. denied*, 115 S. Ct. 1266 (1995); *United States v. Olano*, 507 U.S. 725, 730-37 (1993). Even where an error meets these requirements, however, we will not exercise our discretion to correct it unless it "seriously affect[s] the fairness, integrity, or public

_____

(...continued)
in the record indicates that he raised it prior to trial under FED. R. CRIM. P. 12(b)(2). Whatever double jeopardy claims he might have had have therefore been waived. *See Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993).

8

reputation of judicial proceedings." *Calverley*, 37 F.3d at 164 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

The district did not err, and certainly did not commit plain error, in admitting Carrick's testimony. *Bozeman* instructs us that whether a statement amounts to a threat under § 875(c) depends on its context. *Bozeman*, 495 F.2d at 510. In order to convict, a factfinder must determine that the recipient of the in-context threat reasonably feared it would be carried out. *Id*. It was entirely appropriate, then, for the jury to consider the context of Myers's threat, for the context was directly relevant to how Carrick perceived the threat. Indeed, it probably would have been inappropriate for the jury not to consider these statements.

Without citation to FED. R. EVID. 403, Myers also argues that the "militia" remarks were unfairly prejudicial. Given that these statements were directly relevant to one of the core issues in this case, we do not believe that their probative value was substantially outweighed by the danger of unfair prejudice, and instead we conclude that it was not plain error to admit them.

V.

Myers next argues that the district court erred in refusing a proposed instruction that would have required the jury to find that he intended his statements to be threats. As Myers notes, whether this instruction correctly states the law depends on whether § 875(c) offenses require specific or general intent. The courts of appeals are divided on this issue, and our circuit has never

9

directly addressed the question.

We review the district court's refusal to give the requested jury instruction for abuse of discretion. *United States v. Thomas*, 12 F.3d 1350, 1365 (5th Cir.), *cert. denied*, 511 U.S. 1095, *and cert. denied*, 511 U.S. 1114 (1994). Recognizing the substantial latitude that district courts have in formulating a jury charge, we reverse only if the requested instruction (1) was substantially correct; (2) was not substantially covered in the charge as a whole; and (3) concerned an important point in the trial, the omission of which seriously impaired the defendant's ability to present an effective defense. *United States v. Aggarwal*, 17 F.3d 737, 743 (5th Cir. 1994); *United States v. Gray*, 96 F.3d 769, 775 (5th Cir. 1996); *United States v. Townsend*, 31 F.3d 262, 270 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 773 (1995).

As previously noted, the threshold issue in this determination is whether Myers's requested instruction was correct, which in turn hinges on whether § 875(c) defines a general or specific intent crime. Although this normally would be a simple inquiry, the absence of any explicit *mens rea* requirement from § 875(c)'s text appears to have produced some confusion in the courts. The majority view, represented by cases from the Third, Fourth, and Sixth Circuits, is that a § 875(c) violation requires only general intent. *See United States v. Himelwright*, 42 F.3d 777, 783 (3d Cir. 1994); *United States v. Darby*, 37 F.3d 1059, 1066 (4th Cir. 1994), *cert. denied*, 115 S. Ct. 1826 (1996); *United States v. DeAndino*, 958 F.2d 146, 149 (6th Cir.), *cert. denied*, 505 U.S. 1206

10

(1992).  The Ninth Circuit, in contrast, has at least once taken the position that an § 875(c) conviction requires a showing of specific intent, i.e., that the defendant intended his statement to be perceived as a threat.  *See United States v. Twine*, 853 F.2d 676, 679-80 (9th Cir. 1988).  Like us, the other eight courts of appeals have not previously confronted this issue.

Myers hesitantly urges us to adopt the Ninth Circuit's holding in *Twine*.  We confess to being somewhat baffled by his arguments.  Although he variously describes the Ninth Circuit's reasoning as "strained," "result[-]oriented," and "a bit of boot strapping," he nonetheless asks us to follow it "[i]f only for public policy reasons."  At one point Myers even attempts to argue that we should adopt *Twine*'s interpretation of § 875(c) because the defendant in that case had a mental illness, whereas the defendants in the cases decided by other circuits did not.

Upon a careful reading of both *Twine* and the caselaw of this circuit, we conclude that Myers's characterization of *Twine* is accurate.  *Twine* is something of an outlier within the Ninth Circuit's jurisprudence, and its continued validity has been questioned on the ground that it conflicts with both prior and subsequent Ninth Circuit decisions.[3]  We find the decisions of the Third, Fourth, and Sixth Circuits considerably more persuasive, and consequently we decline to hold that § 875(c) requires specific

---

[3] *See United States v. King*, 920 F. Supp. 1078, 1079-80 (C.D. Cal. 1996) (suggesting that *Twine* conflicts with both *United States v. Sirhan*, 504 F.2d 818 (9th Cir. 1974), and *United States v. Davis*, 876 F.2d 71 (9th Cir.), *cert. denied*, 493 U.S. 861 (1989)).

intent.

Fortunately, we need not delve into public policy to reach this result.  As a straightforward matter of textual interpretation, we will not presume that a statutory crime requires specific intent in the absence of language to that effect.  *See United States v. Hicks*, 980 F.2d 963, 974 (5th Cir.) (citing *United States v. Lewis*, 780 F.2d 1140, 1143 (4th Cir. 1986)), *cert. denied*, 508 U.S. 941 (1993).[4]  Because § 875(c) contains nothing suggesting a specific intent requirement, it defines only a general intent offense.  This in turn means that the district court's instructions were not erroneous, and the government need not show specific intent in order to prove a violation of § 875(c).


VI.

Myers's final argument is that the district court erred in upwardly departing from the Sentencing Guidelines and ordering that some of his terms of supervised release run consecutively.  Specifically, he contends that 18 U.S.C. § 3624(e) does not authorize the "stacking" of supervised release terms and that the commentary to U.S.S.G. § 5G1.2 in fact expressly prohibits such consecutive terms.  The government now concedes that this argument is correct, so we vacate Myers's sentence with respect to all three counts and remand for resentencing.

---

[4] In this respect, the instant case is easily distinguishable from those in which we read a statute as requiring specific intent because its text expressly applies a scienter requirement to each element of the offense or to "violation" of the statute as a whole.  *See, e.g., United States v. Ahmad*, 101 F.3d 386, ___ (5th Cir. 1996).

For the reasons stated above, the judgment of conviction is AFFIRMED, and the case is REMANDED for resentencing.