**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 99-40375**
**Civil Docket #L-98-CR-550-1**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**JOHN J. MURILLO,**

**Defendant-Appellant.**

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

September 12, 2000

Before JONES and BENAVIDES, Circuit Judges, and COBB, District
Court Judge.*

PER CURIAM:**

Appellant John J. Murillo challenges his conviction and

sentence for transmitting threats in interstate commerce in

violation of 18 U.S.C. § 875(c).  Murillo alleges (1) that his

_____

* District Judge of the Eastern District of Texas, sitting by
designation.

** Pursuant to 5TH CIR. R. 47.5, the Court has determined that this
opinion should not be published and is not precedent except under the limited
circumstances set forth in 5TH CIR. R. 47.5.4.

conviction violates the First Amendment or lacks sufficient evidence; (2) that evidence was admitted in violation of the psychotherapist-patient privilege; (3) that evidence of other e-mails was wrongfully admitted against him; and (4) that the court improperly enhanced his sentence. Having carefully reviewed the appeal, we find no error or abuse of discretion and accordingly affirm the judgment and sentence.

As a postal employee in Laredo, Texas, Murillo was disciplined on several occasions beginning in the summer of 1997. He freely vented his anger over conflicts at work to co-workers, fellow union members and postal service management. Murillo referred to himself by nicknames like "Mad Mex" and "Sacred Member" in anti-management e-mails to his co-workers and on Internet postings. In August, 1997, Murillo met voluntarily with a counselor for the postal service Employee Assistance Program named Escamilla. During the counseling session, Murillo railed that "If I had a gun I would Glock out the whole management team" after Escamilla's repeated inquiries about his temporary work suspension. Escamilla, believing this was a potentially serious threat, reported it to his supervisor, who contacted Murillo's immediate supervisor, the target of the threat. Escamilla's action was permitted under the counseling confidentiality guidelines. Angry at this disclosure, Murillo posted an e-mail to a website about the EAP program in which he castigated Escamilla and repeated the Glock threat.

The culmination of Murillo's vitriol was a threat entitled "Death Wish" sent to the home e-mail address of his co-worker William Espinoza, whom he believed to be a close friend. Murillo's prosecution was based on this April 18, 1998 e-mail. The day before, a Dallas postal worker had shot and killed a co-worker. The Death Wish e-mail stated:

> William they are trying to Make Me Go Postal. This Mexican can only take so much, you kick a dog so much and sooner or later that chain will snap. I have been very patient with them but I am tired and have been making plans, they keep f___ing with me and Judgment Day will come. It will be a shootout at the OK Corral. It is only 4 miles to the Mexican Border. The person in Dallas the chain Snapped. Later from Mad-Mex.

Espinoza forwarded this e-mail to Union supervisors, who communicated it to Murillo's supervisors.

The supervisors testified that they took the perceived threat very seriously in light of Murillo's previous behavior and threats. They barred Murillo from the worksite, posted armed security guards, and were escorted to and from the building. One supervisor unfamiliar with Murillo's other e-mails testified in his defense, as did several co-workers. Among other things, a co-worker suggested that some of the inflammatory terms in the Death Wish e-mail were union slang for labor negotiations ("shootout" and "OK Corral"). Murillo was convicted and sentenced *inter alia*, to 15 months imprisonment. He has appealed.

**DISCUSSION**

1.    First Amendment/Sufficiency.

Murillo contends that his e-mail was protected speech under the First Amendment as a matter of law and, relatedly, that there was insufficient evidence of a criminal threat.[3]

Section 875(c) states:

> Whoever transmits in interstate or foreign commerce any communication containing any threat . . . to injure the person of another shall be fined under this title or imprisoned not more than five years, or both.

The threat must be made "knowingly and intentionally," meaning that the defendant uttered the threat voluntarily and not by mistake. United States v. Myers, 104 F.3d 76, 79 (5th Cir. 1997).

A statute like section 875(c), which criminalizes pure speech, "must be interpreted with the commands of the First Amendment clearly in mind." Watts v. United States, 394 U.S. 705, 707 (1969). "What is a threat must be distinguished from what is constitutionally protected speech." *Id.*

Murillo attempts to analogize his case to Watts by asserting that he was engaging in a form of protected speech because he was criticizing a government entity, the Postal Service, his statement was hyperbole not received as a threat by Espinoza,

_____

[3]    A conviction may be overturned for insufficient evidence only if, viewing the evidence in the light most favorable to the government, a rational trier of fact would not have found the essential elements of the offense beyond a reasonable doubt. United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir. 1995).

4

his statement involved union terminology rather than threats, and the recipient was his friend. These arguments are without merit.

Watts is fully distinguishable. The Supreme Court overturned Watts's conviction because his anti-draft remarks were made in the context of a political rally against President Johnson, the crowd laughed in reaction to his statement, and it represented at bottom a crude, hyperbolic political attack. Watts, 394 U.S. at 707-08. Unlike the demonstrator in Watts, Murillo was not criticizing government policy or institutions but the personal discipline he had received. In the employment context, this court has held that an employee asserting that he was wrongfully terminated for engaging in protected speech must show that the speech relates to a matter of public concern. Vojvodich v. Lopez, 48 F.3d 879, 884-85 (5th Cir. 1995). Murillo cannot make such proof. Further, he has not shown that the April 18 e-mail was a form of hyperbole used in a management/union labor dispute, such that it would constitute protected speech. At the time of the Death Wish e-mail, the Union had told Murillo not to send them further similar communications, and the testimony concerning whether some of his terms related to labor disputes was equivocal.

Murillo's final First Amendment argument is that because the e-mail was a private message not sent to the purported victim, it must be construed as protected speech rather than a threat. In support, he cites three district court cases in other circuits.

*See* United States v. Baker, 890 F.Supp. 1375, 1387-90 (E.D.Mich. 1995), *aff'd on other grounds sub nom*, United States v. Alkhabaz, 104 F.3d 1492 (6th Cir. 1997) (private message sent to co-defendant either did not specify a victim or did not evince a true intent to carry out the threats); United States v. Bellrichard, 779 F.Supp. 454, 459-60 (D. Minn. 1991), aff'd., 994 F.2d 1318 (8th Cir. 1993) (no evidence that the defendant wished the threat, communicated to a friend, to reach the judge who was the intended victim, and no evidence that the friend was likely to transmit it); United States v. Fenton, 30 F.Supp. 2d 520, 526-27 (W.D. Pa. 1998) (threats under similar statute, made against a United States representative, were communicated to an insurance adjuster who was not connected to the representative). These cases are dissimilar from Murillo's, because none of them involved communication to a friend who was also a co-worker and fellow union member, and who was intimately connected with the workplace and the supervisors who were the focus of Murillo's indignation. Murillo's threat was uttered much closer to a realistic target. In any event, accepting the defendant's explanation of these cases that a subjective intent not to harm invokes First Amendment protection would conflict with our rule that section 875(c) is not a specific intent crime. Myers, 104 F.3d at 80-81.

Although the Death Wish e-mail was not protected by the First Amendment, there remains Murillo's challenge to the

6

sufficiency of the evidence. A threat is to be interpreted in context to determine whether the communication would reasonably tend to create apprehension that the originator will act in accordance with the threat. Myers, 104 F.3d at 79. The context of this communication – Murillo's building resentment toward his superiors; his threatened firing; his overt manifestations of hostility both face-to-face and in other e-mails; his ignoring the union directive; and the timing of the Death Wish e-mail just after a postal worker's murder in Dallas – all support the rationality of the jury's verdict.

2.   Psychotherapist/Patient Privilege.

Murillo contends that the district court erred in admitting statements he made to Escamilla and in admitting a subsequent Internet message by Murillo referring to the counseling session. Escamilla testified at Murillo's trial about the statement, and the October 13 Internet message was also presented to the jury.

In Jaffee v. Redmond, 518 U.S. 1 (1996), the Supreme Court held that confidential communications between a licensed psychotherapist, or licensed social worker and a patient is privileged. The government assumes that the counseling session with Escamilla was covered by Jaffee, so this point is not disputed. The government does assert, however, that insofar as Escamilla professionally determined that Murillo's statements exhibited the "potential for homicidal ideations" and that

7

Murillo's immediate supervisor could be in danger, EAP guidelines required him to disclose Murillo's statements and alert the supervisor. Thus, no psychotherapist/patient privilege protected such statements. Jaffee, 518 U.S. at 18 n.19. Most likely this is correct.

In any event, however, Murillo waived the privilege when he revealed the entirety of the incriminating statement from the interview to third parties in an Internet posting. A voluntary disclosure of information which is inconsistent with the confidential nature of the relationship waives the privilege. *See* Industrial Clearinghouse, Inc. v. Browning Mfg. Division of Emerson Electric Co., 953 F.2d 1004, 1007 (5th Cir. 1992); Alldread v. Granada, 988 F.2d 1425, 1434 (5th Cir. 1993).

3.  Other E-Mails.

Murillo challenges as an abuse of discretion the district court's admission of eight e-mails and messages spaced between late 1997 and the period shortly after the Death Wish e-mail. Federal Rule of Evidence 404(b) permits evidence of other wrongs or acts as proof of identity, motive and intent, subject to weighing the evidence's probative value against unfair prejudice. *See* United States v. Zanabria, 74 F.3d 590, 592 (5th Cir. 1996). Rule 404(b) does not, however, apply where the other acts are inextricably entwined to the charged crime or are necessary preliminaries to the crime. Coleman, 78 F.3d at 156. This court reviews evidentiary

8

rulings with respect to intrinsic and extrinsic evidence under an abuse of discretion standard.  <u>United States v. Coleman</u>, 78 F.3d 154, 156 (5th Cir.), *cert. denied*, 519 U.S. 891 (1996).

In this case, the government was required to prove that the Death Wish e-mail reasonably caused apprehension in its recipients, a showing that this court has held established by the context in which the threat was received. *See* <u>Myers</u>, 104 F.3d at 79.  Thus, the pre-crime messages tended to prove the reasonableness of management's fear of the Death Wish e-mail, as the district court instructed the jury.  Similarly, Murillo's post-crime e-mails and activities, which included his inquiries about covering the tracks of his earlier communications, were relevant to show consciousness of guilt.  <u>United States v. Martinez</u>, 190 F.3d 673, 678 (5th Cir. 1999).  In these ways, the other e-mails and communications provided intrinsic evidence of the offense.

Alternatively, because Murillo had stipulated to no facts before trial, not even to his authorship of the Death Wish e-mail, the other e-mails were relevant to prove his identity, his intent to send the criminal e-mail, and his motive.  From this standpoint, the district court committed no abuse of discretion in admitting the evidence pursuant to Rule 404(b).  Further, the court instructed the jury not to use any of this evidence to judge Murillo's character.

4.    Sentencing Issues.

9

Murillo challenges both the district court's factual findings and legal interpretation of the Guidelines. We review those determinations according to the usual standards. *See* United States v. Goynes, 175 F.3d 350, 353 (5th Cir. 1999). Murillo first contends that a sentencing enhancement provision (Section 2A6.1(b)(2)), which took effect on November 1, 1997, could not be used to count conduct occurring before that date as an enhancement of the offense conduct. The Supreme Court and this court have recognized, however, that the *ex post facto* clause does not apply to aggravating factors of an offense. *See* Gryger v. Burke, 334 U.S. 728, 732 (1948) ("The sentence . . . is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes. It is a stiffened penalty for the latest crime, which is considered to be an aggravated offense")); *see also* United States v. Saenz-Forero, 27 F.3d 1016 (5th Cir. 1994) (same conclusion in Guidelines context).

Murillo also asserts that the October 13, 1997 Internet posting and December 18, 1997 e-mail message were not threats as defined in U.S.S.G. § 2A6.1(b)(2). We disagree, based on Application Note 2, which refers to prior conduct that is, as here, substantially and directly connected to the offense. The district court's factual findings that the Glock threat and the December 18 e-mail, which stated that Murillo would fix management's wagon for

10

trying to fire him and that "your wagon will get burned" were threats were not clearly erroneous.

For the foregoing reasons, the conviction and sentence are **AFFIRMED**.

11