# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 11, 2011

No. 10-30128

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff–Appellee

v.

ERNESTINE GIROD; UNA FAVORITE BROWN

Defendants–Appellants

---

Cons. w/10-30339

UNITED STATES OF AMERICA

Plaintiff–Appellee

v.

MELINDA LANGLEY

Defendant–Appellant

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

Before HIGGINBOTHAM, DENNIS, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Nos. 10-30128, 10-30339

Ernestine Girod, Una Favorite Brown, and Melinda Langley were each indicted on one count of conspiracy (18 U.S.C. § 371) and multiple counts of health care fraud (18 U.S.C. § 1347), and Brown and Girod were charged with three counts each of making false statements to law enforcement officers (18 U.S.C. § 1001), all in relation to fraudulent Medicaid reimbursement claims made through A New Beginning of New Orleans ("ANBNO"), a Medicaid Early Periodic Screening Diagnosis and Treatment ("EPSDT") organization that provides minor, disabled Medicaid recipients with Personal Care Services ("PCS").  A jury convicted the three women on all but three of Langley's health-care fraud counts.  Brown, Girod, and Langley separately appeal their convictions and sentences on various grounds.  We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Brown and Langley worked for ANBNO, a PCS provider co-owned by Akasia Lee, a cooperating witness in the case who pleaded guilty to conspiracy. Specifically, ANBNO provided PCS to disabled children covered under Medicaid, teaching them activities of daily living ("ADL") like personal hygiene, light food preparation, and basic house cleaning.  Each child had a specific plan of care ("POC") that detailed the activities the PCS provider could provide and Medicare would reimburse.  EPSDT PCS services could only be provided in the child's home, and ANBNO employees providing PCS—including Brown and Langley—underwent training in proper documentation, rules, regulations, and services provided.  A binder of all EPSDT rules, regulations, guidelines, time sheets, and the POC was placed in the home of each PCS client.  Brown and Langley claimed to provide PCS services to Medicaid recipients, and Girod had three children on Medicaid who purportedly received PCS from ANBNO employees.

From 2001 to 2006, the defendants, among others, engaged in a conspiracy to defraud Medicaid by creating false documentation that PCS services were

2

provided to Medicaid recipients when the services were not provided. Brown and Langley submitted false PCS time sheets and daily care sheets saying they provided specific PCS services listed in their clients' POCs, at specific times, when these services were not provided. In reality, Brown, Langley, and other ANBNO PCS providers failed to attend mandatory trainings, transported PCS clients around in their cars, took clients to social settings like the park, and babysat them—actions that are all verboten by Medicaid and not Medicaid reimbursable. Parents of PCS-eligible children, including Girod, signed off on their children's PCS time sheets in exchange for kickbacks from Lee and other ANBNO PCS providers. In sum, ANBNO defrauded Medicaid out of approximately four million dollars.

On June 5, 2008, a grand jury returned an indictment against Girod, Brown, and Langley, among others. A superceding indictment was issued on February 12, 2009, charging Girod with conspiracy (Count 1), twenty-five counts of health care fraud (Counts 15–39), and three counts of false statements to law enforcement officers (Counts 60–62); Brown with conspiracy (Count 1), ten counts of health care fraud (Counts 5–14), and three counts of false statements to law enforcement officers (Counts 63–65); and Langley with conspiracy (Count 1) and thirteen counts of health care fraud (Counts 17–59), among other defendants.

Brown filed a motion to dismiss the indictment due to prosecutorial misconduct in May 2009. After the magistrate judge conducted a hearing, he recommended that the district court deny the motion. The district court conducted two additional days of hearings on Brown's motion and summarily denied it on August 24, 2009. A jury trial was held from September 4, 2009, to September 9, 2009. The jury convicted Brown on Counts 1, 5–14, 63, and 65; Langley on Counts 1 and 47–56; and Girod on Counts 1, 15–39, and 60–62. Girod was sentenced to 24 months' imprisonment, a special assessment, and

restitution in the amount of $68,140. Brown was sentenced to 21 months' imprisonment, a special assessment, and restitution in the amount of $33,405. Langley was sentenced to 15 months' imprisonment, a special assessment, and restitution in the amount of $47,717. Each also received a three-year term of supervised release.

The defendants separately timely filed their notices of appeal.

## II.  ANALYSIS

**A.     Brown's Motion To Dismiss the Indictment Due to Prosecutorial Misconduct**

The Sixth Amendment guarantees a criminal defendant the right to present witnesses to "establish his defense without fear of retaliation against the witness by the government." *United States v. Dupre*, 117 F.3d 810, 823 (5th Cir. 1997). "In addition, the Fifth Amendment protects the defendant from improper governmental interference with his defense." *United States v. Bieganowski*, 313 F.3d 264, 291 (5th Cir. 2002) (internal quotation marks and citations omitted). Thus, "substantial governmental interference with a defense witness' choice to testify may violate the due process rights of the defendant." *Dupre*, 117 F.3d at 823 (quoting *United States v. Whittington*, 783 F.2d 1210, 1219 (5th Cir. 1986)). Whether a defendant has made a showing of substantial interference is a fact question, and we therefore review a claim of prosecutorial intimidation for clear error. *United States v. Thompson*, 130 F.3d 676, 686–87 (5th Cir. 1997). Any violation is subject to harmless-error analysis, and we "will not reverse unless the prosecutor's conduct was sufficiently egregious in nature and degree so as to deprive [the defendant] of a fair trial." *United States v. Skilling*, 554 F.3d 529, 567 (5th Cir. 2009) (internal quotation marks and citation omitted) (substitution in *Skilling*, *aff'd in part and vacated on other grounds by Skilling v. United States*, 130 S. Ct. 2896 (2010).

Likewise, "as a general rule, '[w]itnesses . . . to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them.'" *United States v. Soape*, 169 F.3d 257, 270 (5th Cir. 1999) (quoting *Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966)) (second alteration in original). Of course, "[n]o right of a defendant is violated when a potential witness freely chooses not to talk [to defense counsel]." *In re United States*, 878 F.2d 153, 157 (5th Cir. 1989).

1.   **The Government's Visits to Defense Witnesses Allen and Randall**

Brown argues that the Government substantially interfered with her right to present witnesses in her favor when agents visited Semaj Allen and Lakita Randall—both identified as defense witnesses on Brown's pretrial disclosures—and questioned them regarding the Medicaid fraud at ANBNO. Allen and Randall subsequently declined to testify on Brown's behalf. They were school teachers who worked with Brown at the same school and were PCS providers with ANBNO. Brown alleges that Allen and Randall would have testified that Brown spent time with the Morales boys—two children Brown provided PCS for—before school, at the park, and at football practice.[1]

We affirm Brown's convictions on this ground because the district court did not clearly err in deciding that the agents' conduct did not substantially interfere with Allen's and Randall's free choice to testify. Both the prosecution and the defense have a right to interview witnesses; the fact that Allen and Randall were interviewed after the Government found out they were on the defense witness list was not improper, even if the Government previously knew Allen and Randall were connected with ANBNO. The undisputed testimony was that the

---

[1] None of these facts could have exonerated Brown for Medicaid fraud, as the charges against her were for a failure to provide the specific PCS services claimed on her time sheets on the dates and times claimed, not a failure to generally spend time with her PCS clients.

two agents asked to talk with both witnesses about the ANBNO investigation, informed them that they did not have to speak with them, and told them that answering questions was voluntary and that they could stop the interview at any time.  The agents did not tell Allen or Randall that they were targets of the Medicaid fraud investigation nor did they tell Allen or Randall that they had engaged in wrongdoing or criminal conduct.  Nor did the "Martha Stewart" warning that Allen's and Randall's only obligation was to speak truthfully amount to "substantial interference" in their decision to testify.  *See Bieganowski*, 313 F.3d at 291–92 (holding that prosecutor's comment that a defense witness could be prosecuted for perjury did not amount to substantial interference); *Thompson*, 130 F.3d at 687 (holding that a warning of the consequences of perjury "even if carried out in a caustic manner, is no cause to dismiss the indictment against the defendants") (citation omitted).

In short, Brown hangs her hat on the correlation between the agents' interviews and the witnesses' subsequent decisions not to testify on Brown's behalf.  But correlation is not enough; Brown must at a minimum prove causation.  The district court rejected Brown's causation argument and this finding was not clearly erroneous.  *See Skilling*, 554 F.3d at 571 (rejecting a "proof in the pudding" argument that there must have been substantial interference where many potential witnesses declined to cooperate with the defense); *Thompson*, 130 F.3d at 687 ("The defendant bears the burden of showing that testimony would have been different *but for* the government's actions.").  There are a multitude of reasons why Allen and Randall may have decided not to testify, neither witness testified to improper conduct on the part of the agents, and Allen stated in her affidavit that her decision not to testify was not due to intimidation by the prosecution.

Even if the information Allen and Randall obtained from the interviews *caused* the witnesses to decide not to testify on Brown's behalf, Brown has

6

nevertheless failed to show that the district court committed clear error when it found that there was no substantial interference with Allen's and Randall's *free choice* to decide for themselves whether they wished to testify.  Presenting the potential defense witnesses with the facts of the investigation and the crimes charged does not amount to witness intimidation; there must be evidence of threats or intimidation. *See United States v. Viera*, 839 F.2d 1113, 1118 (5th Cir. 1988) (en banc); *Bieganowski*, 313 F.3d at 291–92.  Testimony from the special hearings on Brown's motion to dismiss the indictment shows that neither Allen nor Randall knew the details of the crimes of which Brown was charged before meeting with the agents, that Allen never felt threatened or intimidated by the agents and that she subsequently decided she did not want to put her family through the stress of trial, and that Randall was generally uncooperative and Brown could only speculate as to the reason why Randall decided not to testify on Brown's behalf.  The government's right to interview Allen and Randall did not disappear simply because they may have been ignorant of Brown's crimes.  If, after learning the true nature of Brown's alleged crimes, Allen and Randall decided not to testify on her behalf for whatever reason, that is their choice.

### 2.     The Government's Phone Call to Prosecution Witness Lee

Brown also alleges prosecutorial misconduct relating to prosecution witness Akasia Lee, a co-owner of ANBNO who pled guilty to Count 1 of the indictment and became a cooperating witness for the Government.  At the evidentiary hearings and in affidavits, the uncontroverted evidence was that Lee had a meeting with prosecutors on March 25, 2009, at 10:00 a.m., and that she had also scheduled a meeting with the defense for the same date and time.  At around 10:15 a.m., Lee was sitting in the defense office, and the defense meeting had not yet started due to an attorney being late.  Agent Delanueville called Lee at 10:15 to remind her of her appointment with the prosecution, and told her she

should honor her meeting. Lee left the defense office and went to meet with the prosecution. Thereafter, Lee did not meet with the defense.

Brown points to evidence that the prosecutor was angry that Lee was meeting with the defense, and the prosecutor told Lee it was not in Lee's best interest to meet with defense counsel without her attorney present. During the evidentiary hearing, Brown's attorney Avery Pardee testified that she talked with Lee's attorney David Belfield after the March 25 incident, and that he told her that he did not want Lee meeting with anyone and that the prosecutor wanted to be present for all meetings with Lee. In his affidavit, however, Belfield stated that the prosecutor did not demand to be present during defense interviews with Lee and that the prosecutor did not "shut down" Lee's March 25 meeting with the defense. As Pardee admitted on cross-examination during the evidentiary hearing, no witnesses told her that they were told not to cooperate with the defense, she had no evidence of threats or retribution, and it had been three months since she had tried to schedule a meeting with Lee.

Accordingly, we hold that the district court did not clearly err when it denied Brown's motion to dismiss the indictment on this ground, and we affirm Brown's convictions.

## B.   Sufficiency of the Evidence Supporting Girod's Convictions

We review a district court's denial of a motion for judgment of acquittal de novo. *United States v. Myers*, 104 F.3d 76, 78 (5th Cir. 1997).[2] The jury's verdict will be affirmed "if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt."

---

[2] Contrary to the Government's assertion, Girod's counsel clearly moved for acquittal of all charges "for failure to prove the case beyond a reasonable doubt," and *in addition*, specifically challenged Counts 60–62 for listing the incorrect date of Girod's false statements. Girod's appeal challenging the denial of her motion for a judgment of acquittal is therefore subject to de novo review.

*Id.* In assessing the sufficiency of the evidence, we do not evaluate the weight of the evidence or the credibility of the witnesses, but view the evidence in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict. *Id.* at 78–79.

### 1.     Girod's Ties to the Fraudulent Documents Submitted by Lee

Girod challenges her convictions first on the ground that there was no evidence connecting her to the fraudulent PCS forms submitted to Medicaid by Lee. To prove health care fraud, the Government had to prove that Girod "knowingly and willfully" executed a scheme "to defraud any health care benefit program." 18 U.S.C. § 1347(1). To prove conspiracy, the Government had to show that she conspired with at least one other person to defraud the United States and that one conspirator committed "any act to effect the object of the conspiracy." 18 U.S.C. § 371.

Specifically, Girod argues there was no evidence she was "directly involved or participate[d] in any manner in the conspiracy as there was no proof offered that [she] actually authored or signed any of the documents filed with Medicaid." The Government is not required, however, to show that Girod herself submitted the forms to Medicaid in order to charge her with Medicaid fraud and conspiracy. The indictment charged Girod with creating false time sheets and PCS daily schedules for services she claimed to have witnessed for her children, with being paid by ANBNO and Lee for "creating fraudulent documentation to support billings to Medicaid," and charged that in general false time sheets were made and ANBNO employees were not providing the PCS services claimed. These charges were supported at trial with testimony from Connie Smith, who testified she split her ANBNO check with Girod (for PCS Smith supposedly provided Girod's child but did not) in exchange for Girod giving her blank, pre-signed time sheets. Akasia Lee also testified that Girod filled out false PCS time sheets for her children and split the Medicaid payment with Smith for the PCS services

Smith was claiming for Girod's child, and that Lee gave Girod checks from her own personal account for one-half the payment amount Medicaid would reimburse for the services falsely claimed for Girod's children.

With respect to Girod's argument that no one testified to recognizing her handwriting on any of the PCS documents submitted to Medicaid, Lee testified that she recognized Girod's handwriting on several training sign-in sheets where Girod signed as ANBNO-employee Charvel Steward. Likewise, Audra Scott testified that Girod signed her name on ANBNO forms. While Lee testified that the time sheets were falsified to conform to Medicaid requirements, the jury could have reasonably inferred from Lee's and Smith's testimony that Girod signed the blank PCS forms she gave to Smith.

In sum, there was substantial evidence from which the jury could have concluded that Girod was involved in the conspiracy and that she knowingly and willfully participated in the health care fraud at ANBNO.

### 2.    Girod's Specific Intent To Commit Medicaid Fraud

Girod also argues she lacked the intellectual capacity to form the specific intent to commit fraud. Girod points to evidence that she only completed eighth grade and had difficulty reading, and that Dr. Michael Chafetz (Ph.D.), a neuropsychologist, determined that she had low verbal comprehension, read at a fifth-grade level, and had a first- or second-grade level of reading comprehension. While Girod may have had a low level of education and was low performing, there was sufficient evidence from which a rational jury could have determined she had the mental capacity to form the specific intent to commit health care fraud.

On cross-examination, Dr. Chafetz testified that Girod is capable of knowing right from wrong, knowing that stealing is wrong, and telling a lie. He also testified that Girod has passed a drivers' test, has raised kids, and can sign and cash checks. According to Dr. Chafetz, Girod is capable of making decisions,

and she tested at the nineteenth percentile (81% do better) for daily living skills, which is adequate.  Dr. Chafetz further testified that she is also capable of fulfilling basic activities of daily living and recognizing when someone else is doing that for her children.  Multiple other witnesses who know Girod testified that they did not know or suspect she had any mental disabilities or problems.  Christie Coleman, the parent of one of Girod's PCS clients, testified that, in the fourteen years she had known Girod, Girod never seemed mentally impaired and never had any problems communicating with her.  Scott testified that she had no knowledge that Girod had any mental or physical problems.  Lee testified that Girod never showed any difficulty in understanding the material explained in the training sessions.

Multiple witnesses testified that, while Girod was never an ANBNO employee, she posed as Steward at training sessions (sign-ins and taking tests), picked up Steward's checks and mail at ANBNO, and signed payroll receipt forms in Steward's name.  The jury could have concluded based on Dr. Chafetz's testimony that Girod could understand that it was wrong to pretend to be someone else, and that she did it anyways by helping Steward avoid the mandatory ANBNO training requirements for providing PCS services.  Finally, Scott testified that Girod asked her to put Girod's checks in Scott's name to avoid involving Girod's social security withholdings.  Girod's purposeful tax fraud is further proof Girod had the capacity to commit health care fraud.

Viewing all the evidence in the light most favorable to the verdict, the jury could have reasonably concluded that Girod knew right from wrong, knew PCS services were not being provided to her children, and knew she was pre-signing blank PCS time sheets for services that were not being provided to her children in exchange for money from Lee and Scott.

### 3.   Whether the Crimes Affected Commerce

Girod also argues the Government did not show the health care crimes affected commerce. Specifically, she argues that because the acts all involved Louisiana businesses and Louisiana residents, interstate commerce was not affected. We disagree. There was ample evidence from which the jury could have concluded that the Louisiana Medicaid program is a joint federal–state program in which ANBNO participated.

To the extent Girod's challenge is that the jury instruction was vague and did not specify how the program must affect commerce, she did not challenge the instruction at trial, and we therefore review this challenge for plain error.[3] *See United States v. Klein*, 543 F.3d 206, 212 (5th Cir. 2008). The district court instructed the jury that the crimes charged must be against a "health care benefit program," which, *inter alia*, is a program "affecting commerce." Even if the instruction was erroneously vague, any error did not affect Girod's conviction as there was substantial testimonial evidence explaining ANBNO's ties to Medicaid, which is a federally funded program that indisputably affects interstate commerce. *See id.*; *United States v. Hickman*, 331 F.3d 439, 443–44 (5th Cir. 2003) (finding no plain error where the district court failed to include the words "affecting commerce" in the instruction on health care fraud). Nor does Girod's conviction on this count seriously affect the fairness or integrity of the judicial proceedings, as she does not contend that Medicaid is not a "health care benefit program" under the statute.

---

[3] Error is plain only when it is clear or obvious and it affects the defendant's substantial rights. A defendant's substantial rights are only affected if the error "affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993). If these conditions are met, then we will only reverse the error if it seriously affects the "fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631–32 (2002) (citation omitted).

Nos. 10-30128, 10-30339

Girod also cites to *United States v. Chambers*, 408 F.3d 237 (5th Cir. 2005), a case that involved a constructive amendment to an indictment on the "interstate commerce" element of the crime of a felon in possession of ammunition. In *Chambers*, the indictment articulated a specific theory of how the ammunition affected interstate commerce, and the jury convicted on a different theory. This Court explained that Chambers's conviction had to be overturned because to allow a conviction based on the second theory "would allow that element to be established on the basis of a set of fact wholly different, separate and distinct from the one set of facts particularly alleged in the indictment relevant to that element, and would thus constitute an impermissible constructive amendment of the indictment." *Id.* at 247. Here, there is no dispute that the "affecting commerce" element of health care fraud has always been that the fraud was to Medicaid, a federally funded program that affects commerce.

### 4.    The Date Alleged in the Indictment

Girod also moved for acquittal below based on the failure of the government to prove the date charged in the indictment beyond a reasonable doubt. The indictment charged her with making false statements "on or about August 26, 2006," but the testimony from trial showed that the false statements were made on April 26, 2006. Girod argues this four-month discrepancy constitutes a material variance from or constructive amendment of the indictment under *Chambers.* We disagree.

"A constructive amendment occurs when the government changes its theory during trial so as to urge the jury to convict on a basis broader than that charged in the indictment, or when the government is allowed to prove 'an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment.'" *United States v. Robles–Vertiz*, 155 F.3d 725, 728 (5th Cir. 1998) (quoting *United States v. Salvatore*, 110 F.3d 1131, 1145 (5th

13

Cir. 1997)).  In this Circuit, "an allegation as to the time of the offense is not an essential element of the offense charged in the indictment and, 'within reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient.'" *Russell v. United States*, 429 F.2d 237, 238 (5th Cir. 1970) (per curiam) (citation omitted); *see United States v. Tunnell*, 667 F.2d 1182, 1186 (5th Cir. 1982) ("In this circuit, it is established that the prosecution is 'not required to prove the exact date; it suffices if a date reasonably near is established.'") (quoting *United States v. Grapp*, 653 F.2d 189, 195 (5th Cir. 1981)); *see also United States v. Valdez*, 453 F.3d 252, 259–60 (5th Cir. 2006) (same).  The discrepancy between the indictment and the evidence at trial therefore is not a constructive amendment, as the date is not an essential element that was proved on an alternate basis and the Government's theory of guilt at trial did not change.

A variance occurs "when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense."  *United States v. Delgado*, 401 F.3d 290, 295 (5th Cir. 2005).  We determine whether a variance occurred by comparing the evidence presented at trial with the language of the indictment. *See United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998).  If a variance did occur, we reverse only if the variance prejudiced the defendant's substantial rights.  *See Delgado*, 401 F.3d at 295; *Medina*, 161 F.3d at 872.  In determining whether a variance resulted in prejudice, we employ a harmless-error analysis. *United States v. Ramirez*, 145 F.3d 345, 351 (5th Cir. 1998); *United States v. Dean*, 59 F.3d 1479, 1491 (5th Cir. 1995).

The discrepancy in dates is not a material variance.  "A five-month variance between the date alleged and the date proved is not unreasonable as a matter of law as long as the date proven falls within the statute of limitations and before the return of the indictment."  *United States v. Wilson*, 116 F.3d 1066,

1089 (5th Cir. 1997) (citation omitted), *vacated on other grounds by United States v. Brown*, 161 F.3d 256 (5th Cir. 1998) (en banc); *see Russell v. United States*, 429 F.2d 237, 238 (5th Cir. 1970) ("[W]ithin reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient."). Because the April 26, 2006 date is only four months apart from the date charged in the indictment and there is no dispute that it falls within the statute of limitations, Girod's argument that this variance warrants overturning her convictions fails.

Moreover, a variance between allegations and proof is fatal "only when it affects the substantial rights of the defendant by failing to sufficiently notify him so that he can prepare his defense and will not be surprised at trial." *Phillips*, 664 F.2d at 1036. The Government used the "on or about" designation in the indictment, explained the context in which the false statements were made, and explained the specific statements that were false and made to federal investigators. Girod's false statements charged in the indictment were: (1) "that an employee from ANBNO was present in her house for two hours per day with each child for a total of 6 hours per day"; (2) "that ANBNO employees came to her house every day for 6 hours per day, 7 days per week during the entire time her children were enrolled with ANBNO"; and (3) "that AKASIA LEE did not pay her $72 per week every two weeks, or pay her any amount, for billing Medicaid services rendered to GIROD's children." This was sufficiently specific to put Girod on notice of which statements the Government intended to prove were false. Indeed, Girod has not demonstrated that she was surprised or prejudiced in any way by the August 26, 2006 date in the indictment.

In sum, we affirm Girod's convictions on all grounds.

## C.  Girod's Sentencing Enhancements

Because Girod did not object to her sentence on the grounds of an incorrect sentencing enhancement before the district court, our review is for plain error.

*United States v. Jasso*, 587 F.3d 706, 709 (5th Cir. 2009). Plain error exists when: "(1) there was an error; (2) the error was clear and obvious; and (3) the error affected the defendant's substantial rights." *Id.* (quoting *United States v. Villegas*, 404 F.3d 355, 358–59 (5th Cir. 2005)) (internal quotation marks omitted). "If all three conditions are met an appellate court may then exercise its discretion to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 709 n.4 (quoting *United States v. Ellis*, 564 F.3d 370, 377 (5th Cir. 2009)) (internal quotation marks omitted). This Court reviews a district court's interpretation and application of the guidelines de novo. *United States v. Cisneros–Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008).

### 1.    Section 3B1.4: Use of Minors To Further the Crimes

USSG § 3B1.4 provides for a two-level enhancement for using a minor to commit the offense. The application notes to § 3B1.4 explain that "using" "includes directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." USSG § 3B1.4 cmt. n.1. The district court enhanced Girod's sentence by two levels under § 3B1.4 for using her underage children to complete fraudulent Medicaid forms. At sentencing, the district court stated that it relied on Scott's testimony that Girod used her children to create the false PCS time sheets. Girod argues that Scott's testimony did not show that Girod directed her children to falsify Medicaid forms but rather that it was that Scott, Girod, and Girod's children all sat together and copied the false forms, and that Scott did not testify that Girod directed her children to complete the forms.

Scott testified that she, Girod, and two of Girod's children were in the kitchen filling out false PCS forms. Girod and her two children were already filling the forms out when Scott arrived and sat down to help. She testified that they all copied off of other forms or old papers. These false PCS forms were then

submitted to ANBNO. This is more than enough to support the district court's finding that Girod "used" her minor children to commit the charged offenses. *See United States v. Mata*, 624 F.3d 170, 175–77 (5th Cir. 2010) (explaining the case law). Scott testified that Girod's children were much more than mere passive observers of Girod's criminal acts; rather, Girod took "some affirmative action to involve" her minor children in actively creating fraudulent PCS time sheets. *Id.* at 176.

### 2.    Section 3C1.1: Obstruction of Justice

Finally, Girod challenges her two-level enhancement under § 3C1.1 for obstruction of justice for lying to investigators. Girod argues there is no evidence she impeded the investigation because the agents investigating her had completed most of their investigation before they interviewed her and they came to their interview "armed with documentation to confront" her if she made statements contrary to what the agents believed happened. In essence, Girod argues "no harm, no foul": that, by the time she made her (admittedly) false statements, the investigation had so progressed that her false statements "did not hamper the investigation." This argument lacks merit. Section 3C1.1 also provides for a two-level enhancement for *attempted* obstruction or impeding justice. There does not seem to be any dispute that Girod made false statements, and that these statements at a minimum reflected her attempt to impede the investigation.

Furthermore, the commentary to § 3C1.1 states that "[t]his adjustment also applies to any other obstructive conduct in respect to the official investigation, prosecution, or sentencing of the instant offense where there is a separate count of conviction for such conduct." USSG § 3C1.1 cmt. n.4. Girod was convicted of making three false statements to federal investigators regarding whether ANBNO employees provided PCS services to her children and whether she received kickbacks for signing-off on the false PCS sheets for her

children, and these convictions formed the basis for her § 3C1.1 enhancement. While Girod points to commentary note 4's example of covered conduct (G), which includes "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense," note 4 is equally clear that its list of covered conduct is "non-exhaustive" and that, as explained above, the enhancement also applies when there are separate convictions for obstructive conduct.  USSG § 3C1.1 cmt. n.4.

We accordingly affirm Girod's sentence.

### D.    Testimony of Langley's Other Acts

We "review a district court's evidentiary rulings for abuse of discretion," subject to harmless-error analysis. *United States v. Cantu*, 167 F.3d 198, 203 (5th Cir. 1999).  "[F]or any of the evidentiary rulings to be reversible error, the admission of the evidence in question must have substantially prejudiced [the defendant's] rights." *United States v. Sanders*, 343 F.3d 511, 519 (5th Cir. 2003). Langley appeals her convictions on the basis that the district court abused its discretion when it allowed the Government to present testimony that Langley provided alcoholic beverages and marijuana to two PCS clients under Federal Rule of Evidence 404(b) as either intrinsic or extrinsic evidence of health care fraud.

Rule 404(b) only limits the admissibility of extrinsic evidence, not intrinsic evidence.  *See United States v. Sumlin*, 489 F.3d 683, 689 (5th Cir. 2007). "Evidence of an act is intrinsic when it and evidence of the crime charged are inextricably intertwined, or both acts are part of a single criminal episode, or it was a necessary preliminary to the crime charged." *Id.*  "Intrinsic evidence is admissible to complete the story of the crime by proving the immediate context of events in time and place" and to "evaluate all of the circumstances under which the defendant acted." *United States v. Rice*, 607 F.3d 133, 141 (5th Cir.

18

2010) (internal quotation marks and citations omitted).  If evidence is extrinsic, Rule 404(b) and *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), require that we first determine "that the extrinsic evidence is relevant to an issue other than the defendant's character, *i.e.*, motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Sanders*, 343 F.3d at 518.  "Second 'the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403.'" *Id.*  (quoting *United States v. Anderson*, 933 F.2d 1261, 1269 (5th Cir. 1991)).

Langley was charged with conspiracy and with thirteen counts of health care fraud for knowingly preparing fraudulent PCS time sheets for Medicaid reimbursement with the intent to defraud.  Langley's theory of defense was that she was just doing what she had been told to do when she filled out her time sheets, and that she did not know it was wrong or fraudulent to record times and activities she did not actually perform—that is, that she lacked the specific intent to defraud.  At trial, Langley testified that: she "took care" of her PCS charges; she did not know anything illegal was going on; that she did not know she was doing anything wrong; and Lee made her change her time sheets so Medicaid would accept them and they all would get paid.  Langley testified that she "put in the time" with her PCS clients listed on the time sheets and worked more than the hours claimed, but that the specific times and activities listed were not always accurate.  She testified that she "never questioned Akasia Lee on anything, I just did my job."  She further testified that she never saw her clients' POCs and was never instructed to follow a POC.

The Government introduced evidence that Langley's PCS clients smoked marijuana and drank alcohol in her care.  To prove its case, the Government had Joyce and Jonus Perrier, two of Langley's former PCS clients who were 13-years old when Langley committed her crimes, testify.  Joyce Perrier testified that

when Langley was supposed to be providing PCS services in their home, she brought Joyce and Jonus over to her house where Joyce watched television and Jonus smoked marijuana with Langley's boyfriend.  She also testified that Langley gave her alcohol.  Jonus testified that Langley brought them over to her house and that he smoked marijuana and drank alcoholic beverages at her house.  The Government claimed that this evidence was necessary to prove Langley's specific intent to commit health care fraud and that she knew that the "services" she provided could never be mistaken as Medicaid-reimbursable PCS.  After a hearing on the motion (among other motions in limine), the district court issued a written order that, *inter alia*, granted the Government's motion in limine to admit the testimony without specifying the theory under which it was allowing the evidence.

This testimony is not intrinsic to Langley's crimes.  The "criminal episodes" charged were Langley's fraudulent completion and submission of the PCS time sheets for the children in her care, which occurred separate from when Joyce and Jonus engaged in the illicit activities at Langley's home.  Evidence of drug and alcohol use in Langley's home, therefore, is not part of a "single criminal episode," nor does it "complete the story of the crime by proving the *immediate* context of events in time and place."  While the Government argues that the drug and alcohol use is "inextricably intertwined" with the crimes charged and helpful to "evaluate all of the circumstances under which" Langley acted, the drug and alcohol use is much more removed in time and space from—and significantly less similar than—the criminal acts charged in other cases in which we have found other-acts evidence to be intrinsic.  *See Rice*, 607 F.3d at 141–42 (finding that the defendants' four unsuccessful robbery attempts were intrinsic to the crime charged of carjacking the same night); *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996) (holding that evidence that the

20

defendants had attempted to carjack two other luxury cars on the same day before carjacking a Mercedes—the crime charged—was intrinsic).

Nor does the evidence of drug and alcohol use closely go to the conspiracy charge, a crime for which we have given greater latitude in classifying evidence as intrinsic. *See United States v. Brown*, 399 F. App'x 455, 460 (5th Cir. 2010) (per curiam) (unpublished) (ruling that the defendants' drug use was intrinsic to a conspiracy to steal mail, because the conspiracy's origin was a desire to obtain financial information from the mail in order to purchase merchandise that would later be traded for drugs); *United States v. Watkins*, 591 F.3d 780, 784–85 (5th Cir. 2009) (finding no plain error where a district court admitted as intrinsic evidence that the defendant admitted involvement in prior drug runs to establish how a cocaine conspiracy was structured and operated, and explaining that other-acts evidence may be admissible in conspiracy cases). Rather, the evidence relates to Langley's mental state when she filled out the PCS time sheets, which is extrinsic to the individual health care fraud counts.

While we remain skeptical that the Perriers' testimony would pass a Rule 403 analysis as required for extrinsic evidence under *Beechum* and Rule 404(b), we need not decide whether the district court abused its discretion in admitting the evidence because its admission was nevertheless harmless and did not substantially prejudice Langley's rights. Joyce's and Jonus's testimony regarding drug and alcohol use at Langley's home was only one portion of their testimony, which focused on what PCS services Langley did not do for them. Langley and two of her adult children contradicted the Perriers' testimony and testified that no alcohol or drugs were ever served in Langley's home. In closing, the Government mentioned Joyce's and Jonus's testimony about alcohol and drug use only very briefly, and emphasized that the case was about Langley lying on her PCS forms and not about Langley being confused about what constituted PCS services. Compared to all the evidence presented against

Nos. 10-30128, 10-30339

Langley, Joyce's and Jonus's testimony about marijuana and alcohol was given very little time at trial.  Given the relatively small portion of the Government's case against Langley that it constituted, its admittance at trial was harmless.

### III.  CONCLUSION

For the foregoing reasons, Girod's, Brown's, and Langley's convictions and sentences are affirmed.

AFFIRMED.