**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 25, 2012

Lyle W. Cayce
Clerk

No. 11–40488

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

ORLANDO JESUS HALE, also known as Chacho,

Defendant – Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, DeMOSS, and STEWART, Circuit Judges.

PER CURIAM:

This appeal involves former Laredo Police Officer Orlando Jesus Hale's jury trial conviction for (i) conspiracy to possess with intent to distribute more than 5 kilograms of cocaine, and (ii) using or carrying a firearm in relation to a drug trafficking offense or possessing a firearm in furtherance of a drug trafficking offense. Hale challenges numerous aspects of his trial and sentencing. For the following reasons, we affirm Hale's conviction and sentence.

I.

In the fall of 2008, Laredo Police Officer Pedro Martinez, III, contacted his friend Juan "Guero" Hernandez and asked Guero if he could supply cocaine to

No. 11–40488

Martinez's father. At the time, Martinez's father was trying to become a middleman who would resell the cocaine to his known drug dealer acquaintance at a higher price. Martinez believed his father would share with him the profits gained from any future drug transactions. In response to the request, Guero introduced Martinez to Adolfo "Tony" Baesa, Jr., who Guero said was his uncle and who had access to large quantities of cocaine. Unbeknownst to Martinez, Guero was a confidential informant for the Bureau of Alcohol, Tobacco, and Firearms, and Tony was not Guero's uncle but an undercover agent for the Federal Bureau of Investigation (FBI).

In order to gain Tony's trust, Martinez agreed to act as an escort for a vehicle Tony and Guero said was carrying cocaine. On the night of October 15, 2008, Martinez, driving his police cruiser, escorted one of Tony's vehicles across town. Martinez believed the vehicle contained 20 kilograms of cocaine. At one point during the escort, Martinez heard a helicopter and became suspicious of the situation, and at another point he had to pause the escort to respond to a police call because he was still on duty. During the escort Martinez contacted Guero to ask about the helicopter. Guero reassured him that nothing was wrong with the situation and said that the escort was only a "dry run," meaning no real cocaine was actually being transported. Martinez did not believe that the escort was merely a dry run as Guero suggested, but felt reassured nonetheless and completed the escort as planned. After completing the escort, Martinez met with Tony and was paid $1,000. He and Tony also discussed the possibility of future escorts, at which time Martinez said he had another police officer in mind if Tony needed additional help.

A few days after the initial escort, Martinez told Hale—his friend and fellow Laredo Police Officer—that he had a way for Hale to make some "easy money." After asking whether Martinez thought his contacts were undercover agents, Hale said he was interested and agreed to meet Guero and Tony.

2

No. 11–40488

Martinez never told Hale specifics about his prior cocaine escort which Guero had said was only a dry run.

Hale met with Martinez and Guero several times prior to the next escort. On November 7, 2008, Hale, Martinez, Guero, and Tony all met in an Embassy Suites hotel room to discuss plans for another cocaine escort. Upon arriving at the hotel, Hale took a semiautomatic handgun from his vehicle, cocked it, tucked it into the back waistband of his jeans, and covered it with his t-shirt before walking inside. The meeting lasted approximately one hour, during which time everyone agreed that on future escorts Hale and Martinez would keep their weapons on them, use personal vehicles, use police-issued handheld radios to monitor police channels, and use Nextel push-to-talk phones because they are similar to walkie-talkies and difficult to track. Also during the meeting, Tony distributed new Nextel phones still in the boxes. Hale opened the boxes without leaving fingerprints on them and programmed into the phones each of the participants' phone numbers. FBI agents made audio and video recordings of the meeting using a hidden camera.

On the evening of November 13, 2008, Hale and Martinez each escorted across town vehicles which they were told were transporting 20 kilograms of cocaine. Unbeknownst to Hale or Martinez, no actual cocaine was used in the transports. Neither Hale nor Martinez were paid for these escorts until they drove to San Antonio approximately one week later, where one of Tony's associates, also an undercover FBI agent, paid each of them $1,000. Guero and Tony attempted to arrange one more cocaine escort on November 19, 2008—this time using real cocaine—but neither Hale nor Martinez was available because they were both on duty.

At some point in November 2008, Martinez recorded several of his conversations with Guero. Martinez then told Laredo Police Department Narcotics Sergeant Robert Medina that he had received a telephone call from

No. 11–40488

somebody about possibly escorting cocaine shipments. Martinez did not tell Sergeant Medina that he knew the person, that he had already recorded several conversations, or that he had already been paid for performing an escort. Martinez also never mentioned Hale's involvement. Sergeant Medina advised Martinez to take the information to Internal Affairs, which Martinez did not do, and to record any future telephone calls. Martinez later informed Hale about the recordings and about his conversation with Sergeant Medina. Martinez advised Hale that they could use the recordings and his conversation with Sergeant Medina for their defense as an "undercover thing between us" if they were ever caught. However, Martinez was not authorized to organize or sanction an undercover operation and he never told Hale that he had been authorized by Sergeant Medina to engage in an official undercover operation or that he had the authority to permit Hale to do so. At no time did Martinez or Hale receive specialized training on undercover work, follow formal Laredo Police Department protocol for undercover work, or request or receive pay for performing undercover work related to the cocaine escorts.

Approximately ten months later on September 29, 2009, FBI agents lawfully searched Martinez's father's home. When Martinez arrived at the home, his father was already being interviewed by FBI agents. Martinez was also interviewed by FBI agents and during the interview agreed to initiate and record a telephone conversation with Hale. During the call, Martinez said that his father's house had been raided by the FBI. When asked, Hale said he remembered performing the escorts, but he hung up the phone when Martinez broached the subject of receiving payments.

Several days later on October 1, 2009, FBI agents arranged with the Laredo Police Department to have Hale dispatched to a local hotel room under the auspices of a burglary call in order to allow the FBI agents to conduct an interview of Hale. At the hotel room, the FBI agents, led by lead case agent Troy

4

No. 11–40488

McAdoo, initiated a consensual interview with Hale where they produced several pictures taken from the hidden camera at the Embassy Suites meeting almost a year earlier. Agent McAdoo told Hale that they had been investigating his participation in the cocaine escort operation and that they were aware of his various meetings with Martinez, Guero, and Tony; the November 13, 2008 cocaine escorts; and the $1,000 payment he received in San Antonio. Hale admitted to Agent McAdoo during the interview that he knew Martinez, Martinez's father, and Guero; that he recognized from the pictures where the Embassy Suites meeting had taken place; and that he remembered the purpose of the Embassy Suites meeting. During the interview, Agent McAdoo witnessed Hale's demeanor change from being calm when he arrived at the hotel room to being sick to the point of dry-heaving when he learned of the FBI's investigation into his past conduct. Eventually Hale chose to leave the hotel room and Agent McAdoo terminated the interview.

Around this same time, the Laredo Police Chief ordered that Martinez be placed on administrative duty. Martinez resigned from the Laredo Police Department several months later on February 16, 2010. On February 17, 2010, Martinez pleaded guilty to conspiracy to possess with intent to distribute more than 5 kilograms of cocaine. He was sentenced to 78 months of imprisonment and later became one of the government's key witnesses against Hale.

II.

Hale was indicted for (i) conspiracy to possess with intent to distribute more than 5 kilograms of cocaine, and (ii) using or carrying a firearm in relation to a drug trafficking offense or possessing a firearm in furtherance of a drug trafficking offense. On April 29, 2010, Hale made his initial appearance in court. Thereafter, Hale was placed on unpaid leave from the Laredo Police Department and was released on bond but subject to house arrest and monitoring.

No. 11–40488

On June 17, 2010, the government filed a motion to continue based on the ends of justice, asserting that Agent McAdoo, the FBI's "primary case agent" and one of the government's "crucial witnesses," had suffered a family emergency and was unable to be present for trial which was set to begin on June 21, 2010. Hale objected to the motion. The district court granted the government's motion without a hearing and reset the trial date to August 2, 2010.

On July 20, 2010, the government filed a superseding indictment against Hale, charging him with the same two counts contained in the original indictment—the conspiracy and firearms charges—as well as four new counts of mail and wire fraud related to a separate investigation involving an alleged car theft insurance scheme. At a July 30, 2010 hearing, the district court granted Hale's request for an additional 30 days to prepare for trial on all six counts.

On September 16, 2010, Hale filed a motion to dismiss based on a Speedy Trial Act violation, which the district court denied at a hearing on September 17, 2010. During the hearing the district court reasserted its reasons for granting the government's motion to continue and for granting Hale's 30-day request for additional preparation time, in each case citing the ends-of-justice provision of the Speedy Trial Act.

The trial commenced on September 17, 2010. During the course of the six-day trial, the government presented numerous witnesses (including Martinez, Guero, Tony, and Agent McAdoo) who each testified to the events surrounding the cocaine escort scheme and the undercover FBI operation. The government also presented numerous exhibits (including photographs, video and audio recordings, and the handgun Hale brought to the Embassy Suites meeting) to help establish Hale's involvement in the scheme.

Hale chose to take the stand and testify on his own behalf. He testified that he became a Laredo Police Officer near the end of 2007 and thereafter became close with Martinez because they patrolled the same district and had the

No. 11–40488

same work shifts. He said he trusted Martinez and often looked to him for backup and advice. Describing the cocaine escort activities, Hale testified that Martinez told him about a person named Guero who had contacted Martinez about possibly escorting cocaine for money. Hale said Martinez asked him if he would help conduct an investigation into Guero and Tony so that Martinez could earn a promotion to join the narcotics division. Hale said he agreed to help Martinez with an investigation but that he never personally discussed the investigation with Sergeant Medina or filled out any formal undercover reports or paperwork. Hale testified that he just went along with Martinez in the various meetings with Guero and at the Embassy Suites meeting with Guero and Tony. Hale also testified that Martinez told him there would not be any actual drugs in the vehicles they escorted on November 13, 2008, statements Martinez denied making. Hale admitted to receiving $1,000 from one of Tony's associates when he drove with Martinez and Guero to San Antonio in November 2008, but said that he later gave the $1,000 to Martinez to log into evidence, something Martinez also denied.

On September 27, 2010, the jury returned a verdict of guilty on count one of conspiracy to possess with intent to distribute more than 5 kilograms of cocaine, and count two of using or carrying a firearm in relation to a drug trafficking offense or possessing a firearm in furtherance of a drug trafficking an offense. The jury returned a verdict of not guilty on counts three through six related to wire and mail fraud for the alleged car theft insurance scheme.

On April 11, 2011, the district court sentenced Hale to a total of 295 months of imprisonment and five years of supervised released, and fined him $2,000. Hale timely appealed.

III.

On appeal Hale challenges whether: (i) the district court erred in failing to grant Hale's motions to dismiss based on a Speedy Trial Act violation; (ii) the

district court erred in excluding several out-of-court statements made by Martinez and Martinez's father as inadmissible hearsay; (iii) the district court plainly erred in refusing to instruct the jury with more detail on the substantive crime underlying the conspiracy; (iv) the district court abused its discretion in refusing to instruct the jury on Hale's proposed affirmative defenses of "public authority" and "entrapment by estoppel;" (v) there was sufficient evidence in the record for a rational jury to find Hale guilty of the firearms charge beyond a reasonable doubt; (vi) the district court erred in responding to the jury's question during deliberations regarding the use of fake cocaine during the escorts; and (vii) the district court clearly erred by enhancing Hale's sentence for "obstruction of justice" and "abuse of a position of trust." We address each issue in turn.

A.

Hale asserts that the length of time between his initial appearance on April 29, 2010, and his trial which began on September 17, 2010—a total of 142 calendar days—violated his statutory right to a speedy trial within 70 days. *See* Speedy Trial Act, 18 U.S.C. § 3161 *et seq*.

The Speedy Trial Act requires that a trial commence within 70 days of a defendant's initial appearance, *see* § 3161(c)(1), subject to certain exceptions and tolling periods, *see* § 3161(h). Days that are excluded in computing the time within which a trial must commence include any period of delay resulting from: (i) the court's consideration of any pretrial motion, § 3161(h)(1)(D); (ii) the absence or unavailability of an essential witness, § 3161(h)(3); and (iii) the grant of a continuance on the basis of the court's finding that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial, § 3161(h)(7).

Hale challenges three determinations made by the district court with respect to the days countable toward the 70-day speedy trial clock. First, he challenges the district court's ruling that any Speedy Trial Act claim was waived

No. 11–40488

when he failed to file his motion to dismiss before the district court's scheduling order deadline for filing all pretrial motions. Second, he challenges the district court's grant of the government's June 17, 2010 motion to continue, arguing that the ends of justice were not met by granting the continuance. And third, he challenges the district court's exclusion of the 30-day preparation period which he requested on July 30, 2010. The parties agree that the Speedy Trial Act would be violated if the district court erred in excluding either the 43-day continuance granted pursuant to the government's motion or the 30-day continuance granted pursuant to Hale's request for additional preparation time.

1.

On September 17, 2010, the first day of trial and the day after Hale filed his first motion to dismiss based on a Speedy Trial Act violation, the district court held that Hale had waived his right to file the motion by failing to comply with the court's July 28, 2010 scheduling order which had set August 9, 2010, as the deadline for "filing all pre-trial motions (including motions for discovery, suppression, etc.)." "We review the district court's administrative handling of a case, including its enforcement of the local rules and its own scheduling orders for abuse of discretion." *Macklin v. City of New Orleans*, 293 F.3d 237, 240 (5th Cir. 2002).

Federal Rule of Criminal Procedure 12 governs pleadings and pretrial motions. Rule 12(b)(3)(A) describes motions that must be made before trial and includes "a motion alleging a defect in instituting the prosecution." Rule 12(c) provides that a district court may "set a deadline for the parties to make pretrial motions." And Rule 12(e) provides that a party "waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides."

Hale does not dispute that the district court set an August 9, 2010 deadline for all pretrial motions and that he did not file a motion to dismiss

9

No. 11–40488

based on a Speedy Trial Act violation until September 16, 2010. However, he argues that (i) the scheduling order was vague because it did not specifically include Speedy Trial Act violations in its list of motions covered by the scheduling order, and (ii) the operation of Rule 12 cannot completely foreclose a defendant's right to file a motion to dismiss based on a Speedy Trial Act violation because such a motion may only become available after the deadline set by the scheduling order has passed. The government responds that the scheduling order was not vague but was explicit and inclusive of all pretrial motions, and that our precedent "squarely foreclosed" Hale's argument regarding the scheduling order deadline.

The government is correct only on the first point. The district court's scheduling order set August 9, 2010, as the deadline for "filing all pre-trial motions (including motions for discovery, suppression, etc.)." The phrase "all pre-trial motions" is explicit and inclusive and the parenthetical listing several types of motions explains but does not limit the scope of the order. The scheduling order is not vague and it is clearly meant to cover any pretrial motion either party intends to file.

However, we agree with Hale that it is an abuse of discretion for a district court to find that, pursuant to Rule 12(e), a defendant prospectively waived his right to file a motion to dismiss based on a Speedy Trial Act violation. *See Zedner v. United States*, 547 U.S. 489, 500–03 (2006) (holding a defendant could not prospectively waive his right to make a Speedy Trial Act claim); *see also* § 3162(a)(2) ("Failure of the defendant to move for dismissal *prior to trial* or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section.") (emphasis added). In *Zedner*, the Supreme Court's reasoned that prospective waivers are very different than the retrospective waivers countenanced by § 3162(a)(2) and are therefore impermissible. 547 U.S. at 501–03. Making compliance with Rule 12(b) (required

10

No. 11–40488

pretrial motions), Rule 12(c) (scheduling orders), and Rule 12(e) (waiver) applicable to motions to dismiss based on Speedy Trial Act violations would thus impermissibly force a defendant to prospectively waive his right to a speedy trial for the period of time between the filing deadline and the start of trial.

Moreover, *United States v. Westbrook*, 119 F.3d 1176 (5th Cir. 1997), which the government asserts has "squarely foreclosed" this issue, was decided almost a decade before *Zedner* and dealt primarily with whether one defendant's filing of a motion to dismiss based on a Speedy Trial Act violation was effective for his three co-defendants who did not expressly join in the motion. *See* 119 F.3d at 1184–85. It did not expressly decide that motions to dismiss for a Speedy Trial Act violation must be filed before trial *and* before any scheduling deadline. *Id.* *Westbrook*'s determination that, pursuant to Rule 12(b) and (e), a Speedy Trial Act violation "is a defense, objection ,or request 'which must be made prior to trial,'" does not answer the question of whether a district court's scheduling order deadline established pursuant to Rule 12(c) is effective against a claim of a Speedy Trial Act violation. *See id.* (citing FED. RULE CRIM. P. 12(b) and (e) but not (c)). Ultimately, *Westbrook* is distinguishable from this case, and is abrogated by *Zedner* insofar as it can be read to have held that a Speedy Trial Act violation is a "defect in instituting the prosecution" that must be raised in a motion which complies with a district court's Rule 12 deadline for pretrial motions. *See* FED. RULE CRIM. P. 12(b)(3)(A); *Zedner*, 547 U.S. at 501–03.

In this case, the district court's ruling that Hale waived his right to move for dismissal based on a Speedy Trial Act violation effectively forced Hale to prospectively waive his rights under the Speedy Trial Act from August 9, 2010, through September 17, 2010—a period of 40 days. We find that a defendant cannot prospectively waive his right to assert a Speedy Trial Act claim voluntarily under *Zedner*, and cannot be forced to prospectively waive his right pursuant to Rule 12. Accordingly, based on *Zedner* and the text of § 3162(a)(2),

11

No. 11–40488

which simply requires that motions to dismiss based on Speedy Trial Act violations be filed "prior to trial," we hold that it was an abuse of discretion for the district court to find that Hale waived his right to file a motion to dismiss based on a Speedy Trial Act violation when he failed to file it before the scheduling order deadline of August 9, 2010.

However, because the district court made an alternative holding on the merits that the Speedy Trial Act was not violated because the number of countable days totaled fewer than 70, we must reach the substantive question of whether the Speedy Trial Act was in fact violated.

2.

Hale challenges the district court's grant of the government's motion to continue, arguing both that there were no grounds for an ends-of-justice continuance under § 3161(h)(7) and that Agent McAdoo was not an unavailable essential witness whose attendance could not be obtained by due diligence.

The government filed its motion under seal on June 17, 2010, requesting an ends-of-justice continuance. The motion asserted that Agent McAdoo, the FBI's "primary case agent" and one of the government's "crucial witnesses," experienced a family emergency on June 15, 2010. It stated that Agent McAdoo's wife was hospitalized in Fort Worth near their home, and that he needed to remain in Fort Worth to provide immediate care for their two young children, to determine how to provide for long-term child and medical care, and to stabilize the medical emergency situation. It also stated that Agent McAdoo had "conducted an interview of and received an incriminating statement" from Hale and "directed, led, supervised, planned, implemented, and executed all but one of the key operational plans in the course of the investigation." The motion cited the Speedy Trial Act and stated that the ends of justice were satisfied and "that the delay would avoid a miscarriage of justice by allowing for the testimony of a critical witness . . . and would allow counsel for the defendant and attorney for

No. 11–40488

the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence."

Hale filed an objection on June 18, 2010. In his objection, Hale asserted that he would be prejudiced by a continuance because he was suspended without pay from his job, he was under house arrest, and a jury had already been selected. Hale also stated that the government had not shown that Agent McAdoo was unable to attend trial because "Laredo has several facilities that could provide short term child care" and "[Agent] McAdoo could appear in Laredo during one day and return to his wife and kids in Fort Worth." Hale also challenged the government's assertions that Agent McAdoo had taken an incriminating statement and was a crucial witness.

The district court signed an order granting the motion on June 22, 2010. The order provided that:

> The court finds that the ends of justice are satisfied by the granting of this continuance to August 2, 2010 in order to avoid a miscarriage of justice by the failure to grant the continuance. Special Agent Troy L. McAdoo is a critical fact witness, one who purports to have heard the alleged criminal admissions of the defendant and who was the lead case agent throughout the entire course of the two-year investigation. For reasons completely out of his control, Agent McAdoo experienced an immediate and catastrophic family medical emergency arising out of the witness' wife hospitalization. The witness' physical presence is required immediately in Fort Worth as he is the sole remaining care giver of his and his wife's two small children. The witness' wife will likely require arrangements for treatment at a mental health facility once she is released from the hospital. While the defendant opposes the continuance, the court finds that, as the defendant is out on bond and the evidence is readily available, that there is no indication of prejudice and that evidence will or might perish in the interim. Furthermore, a denial of the continuance would have the effect of denying the attorney for the Government, reasonable time for effective trial preparation taking into account the diligence and the Government's critical need for the witness. Finally, as the emergency was completely unforeseen and unforeseeable, the granting of this continuance was

No. 11–40488

not the result of a lack of diligent preparation or a failure to obtain available witnesses on the part of the attorney for the Government.

Subsequently, at a hearing on September 17, 2010, concerning Hale's motion to dismiss based on a Speedy Trial Act violation, the district court reiterated its reasons for granting the government's June 17, 2010 motion to continue, relying again on the ends of justice.

"We review the district court's factual findings supporting its Speedy Trial Act ruling for clear error and its legal conclusions *de novo*." *United States v. Stephens*, 489 F.3d 647, 652 (5th Cir. 2007). "A judge's finding that a continuance would best serve the ends of justice is a factual determination subject to review under the clearly erroneous standard." *United States v. Eakes*, 783 F.2d 499, 503 (5th Cir. 1986).

The Speedy Trial Act permits a judge to grant a motion to continue "on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." § 3161(h)(7)(A). However,

> [n]o such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

*Id.* Moreover, no ends-of-justice continuance can be granted because of "lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government." *Id.* § 3161(h)(7)(C).

Here, the district court's June 22, 2010 order provided its reasons for granting the government's motion to continue, and its statements at the September 17, 2010 hearing permissibly supplemented those reasons. *See Zedner*, 547 U.S. at 506–07 (accepting a district court's later-expressed reasons for granting an ends-of-justice continuance so long as the reasons are put on the

14

No. 11–40488

record prior to a ruling on a defendant's motion to dismiss under § 3162(a)(2)). The district court's reasons for finding that the ends of justice supported granting the continuance focused on the emergency nature of the medical situation, the necessity that Agent McAdoo remain in Fort Worth for the near term, the integral role Agent McAdoo played in the investigation, the expectation that he would testify to, among other things, Hale's demeanor and several of his "admissions" during the hotel room interview on October 1, 2009, and the perceived lack of prejudice that would result from a continuance. Additionally, the district court expressly found that the continuance "was not the result of [the government's] lack of diligent preparation or a failure to obtain available witnesses."

The medical emergency situation in this case was unforeseeable and unavoidable, and the district court's reasons for granting the continuance are quite persuasive and are set forth at length in the order and on the record. We find that the district court's findings made in its June 22, 2010 order and at the September 17, 2010 hearing are sufficient to satisfy the requirements of an ends-of-justice continuance under § 3161(h)(7)(A) and are not clearly erroneous. *See, e.g.*, *United States v. Lopez*, 426 F. App'x 260, 263 (5th Cir. 2011) (finding no clear error where continuance was granted due to a co-defendant's counsel's conflicting trial schedule and the government's difficulty in securing travel plans for witnesses); *United States v. Howard*, 218 F.3d 556, 562–63 (6th Cir. 2000) (upholding ends-of-justice continuance of four months where prosecution witness went into premature labor and doctor told her to "avoid stress"); *United States v. Twitty*, 107 F.3d 1482, 1489 (11th Cir. 1997) (upholding ends-of-justice continuance where an essential witness was in "ill health"); *United States v. Meyer*, 803 F.2d 246, 247–48 (6th Cir. 1986) (upholding ends-of-justice continuance where an essential government witness had expensive, non-refundable honeymoon plans).

15

No. 11–40488

Even so, Hale argues that under *United States v. Burrell*, 634 F.3d 284 (5th Cir. 2011), we should reject the district court's findings because the government did not establish that Agent McAdoo was unavailable and did not set forth the facts surrounding Agent McAdoo's family emergency in a sworn affidavit or other exhibits. In *Burrell*, we found reversible error where the district court had rejected a Speedy Trial Act challenge but the government "did not present any evidence that it made reasonable efforts to secure [a sheriff deputy witness's] presence at the schedule trial dates." 634 F.3d 284, 292. We reasoned that the Speedy Trial Act's requirement of "due diligence" requires that the government provide evidence of its reasonable efforts to secure a witness's attendance at a scheduled trial date in order to carry its burden of showing any delay was not based on its "failure to obtain an available witness." *Id.* at 292–93 (citing § 3161(h)(7)(C)).

However, *Burrell* does not require the government to provide sworn affidavits or attach exhibits in order to establish that a witness is unavailable and the witness's presence could not be obtained by reasonable efforts. What is required is for the government to show that it did not fail to use reasonable efforts to secure an available witness's attendance. *See id.* Affidavits and other evidence may be helpful in convincing a district court or this court that reasonable efforts were used, but they are not essential. *See, e.g.*, *Howard*, 218 F.3d at 563 (finding that government attorney's unverified affidavit describing witness's labor and medical issues was sufficient evidence upon which to base a continuance).

The government's motion provides enough information for the district court to determine that Agent McAdoo was "a critical fact witness" whose family emergency made him unavailable to attend trial and any efforts to take him away from his family in Fort Worth the same week the incident occurred would be unreasonable. We therefore agree that ends of justice were served by the

16

district court's grant of the government's motion to continue, and find that the district court's exclusion from the speedy trial clock of the days between June 17, 2010, and July 30, 2010, was not clearly erroneous.

3.

Hale also challenges the district court's determination that the 30 days from July 30, 2010, to August 29, 2010 were not excludable as an ends-of-justice continuance. At the September 17, 2010 hearing, the district court stated:

> The court specifically inquired of Mr. Hale and his attorney whether they were asserting their right to that additional 30 days. [They] both said that they were asserting their right to that additional 30 days. . . . But that additional 30 days would also toll the running of the speedy trial clock. And even if it is not a requirement under the statute that the defendant be provided with an additional 30 days, clearly here the court granted the continuance because it was at the request of the attorney and Mr. Hale. And the statute clearly provides that the court can grant a continuance in order to allow counsel adequate time to prepare for trial. And, again, that is one of those situations where the court didn't make a specific finding because it didn't think it was necessary at the time, but that is the situation where obviously in that case where it is the defense counsel asking for more time to prepare for trial. And under all the circumstances, it was certainly appropriate for the court to grant the additional time to prepare for trial in light of the superseding indictment which added more charges, so certainly the ends of justice in that instance outweighed the best interest of the public in setting the case on the regular speedy-trial calendar. So the court also finds that that time should be excluded.

Hale contends that it was reversible error for the district court to exclude the 30-day period of additional time he requested in order to prepare for the four new charges added by the superseding indictment.

The Speedy Trial Act grants a defendant a 30-day window within which a trial may not be commenced without the defendant's written consent, § 3161(c)(2), and these days are countable unless otherwise excluded. *See United State v. Bigler*, 810 F.2d 1317, 1321–22 (5th Cir. 1987). However, the automatic

No. 11–40488

30-day preparation period does not apply to superseding indictments. *See United States v. Rojas-Contreras*, 474 U.S. 231, 234–35 (1985) ("Had Congress intended that the 30-day trial preparation period of § 3161(c)(2) commence or recommence on [the date of a superceding indictment], it would have so provided."); *Eakes*, 783 F.2d at 503 ("A district judge has the discretion to continue a trial under the ends of justice provision even though the Act does not require an additional thirty-days after arraignment on a superseding indictment."). Therefore any excludable days stemming from a continuance following a superseding indictment must be justified by a separate statutory provision.

In this case, the district court relied on § 3161(h)(7), finding on the record that the ends of justice supported granting Hale's requested 30-day continuance so that defense counsel would have time for effective preparation. When questioned on July 30, 2010, both Hale and his defense counsel expressly indicated their desire for additional time to prepare. While the district court did initially indicate (albeit incorrectly) that there may be an automatically excludable 30-day preparation period following superseding indictments, it ultimately based its decision to grant the continuance on the determination that the ends of justice outweighed the best interests of the public in a speedy trial. Because Hale requested this continuance, we cannot find that this determination was clearly erroneous.

With respect to Hale's argument that government filing a superseding indictment shortly before his scheduled trial date was unfair, we find that Hale had options other than simply requesting a 30-day continuance which would toll the speedy trial clock for the original two charges. Hale could have challenged the new and unrelated charges contained in the superseding indictment pursuant to Federal Rule of Criminal Procedure 8(a), which requires that the charged offenses in an indictment be "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts

18

No. 11–40488

of a common scheme or plan." He could have filed a motion pursuant to Rule 12(b) for a defect in the indictment. Or he could have filed a motion pursuant to Rule 14(a) requesting that the court separate the trials of the original two counts and the four new counts. He also could have filed a motion pursuant to Rule 48(b) for unnecessary delay in adding the new charges to the indictment shortly before trial we set to begin on the original two charges. Hale waived any argument he may have had with respect to fairness by failing to directly challenge the superseding indictment before the district court.

Ultimately, the original indictment started one speedy trial clock for the original two charges, and the superseding indictment started a second speedy trial clock for the four new charges. *See United States v. Alford*, 142 F.3d 825, 829–30 (5th Cir. 1998); *United States v. Gonzalez*, 897 F.2d 1312, 1316–17 (5th Cir. 1990). Absent a specific order from the district court, the 30-day ends-of-justice continuance requested by Hale tolled both the original and the new speedy trial clocks. Therefore, because the district court's decision to grant the continuance was not clearly erroneous, the district court properly excluded the 30 days from July 30, 2010, to August 29, 2010, from both speedy trial clocks.

Including the government's ends-of-justice continuance and Hale's ends-of-justice continuance, the final count of non-excludable days is 62 days, well within the required 70-day period. Accordingly, we agree with the district court that there was no violation of the Speedy Trial Act.

B.

Hale challenges the district court's exclusion of several out-of-court statements made by Martinez and Martinez's father as inadmissible hearsay. He alleges that the statements were admissible under Federal Rules of Evidence 613 and 804, and that exclusion of the statements violated the Confrontation Clause of the Sixth Amendment. "We review alleged Sixth Amendment Confrontation Clause violations de novo, but any violations are subject to a

harmless error analysis." *United States v. Templeton*, 624 F.3d 215, 223 (5th Cir. 2010). "If there is no Confrontation Clause violation, we review the district court's limitation of cross-examination for abuse of discretion." *Id.* We review evidentiary rulings regarding the admission of evidence "only for an abuse of discretion." *United States v. Skipper*, 74 F.3d 608, 612 (5th Cir. 1996).

### 1.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI; *see Crawford v. Washington*, 541 U.S. 36, 42 (2004). "However, 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Skelton*, 514 F.3d 433, 439 (5th Cir. 2008) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). Determining whether the exclusion of impeachment evidence is of constitutional concern depends on the reasons for and effect of the exclusion, which "typically includes an inquiry into the admissibility of the evidence under the Federal Rules of Evidence." *Id.* at 440; *see also Kittelson v. Dretke*, 426 F.3d 306, 319 (5th Cir. 2005)).

In this case Martinez testified as one of the government's key witnesses against Hale and the court placed no limitations on defense counsel's ability to cross-examine Martinez as to any prior inconsistent statements he may have made. However, following Martinez's testimony, Hale sought to provide extrinsic evidence in the form of prior out-of-court statements made by both Martinez and Martinez's father to two FBI agents. The statements allegedly made by Martinez were:

- That Martinez "had brought [the known drug dealer] to his dad's property approximately two years before to help set up a deal for [the drug dealer] to store large amounts of cocaine in his dad's house."

No. 11–40488

- "That an individual [Martinez] identified only as Guero . . . was moving large shipments of cocaine in the Laredo area with his family."

- "That on at least two occasions he had provided escorts, but was later told by Guero that there was no cocaine. It was only dry runs, to test his loyalty."

- That Martinez "reported his actions to Sergeant Robert Medina of the Laredo Police Department Narcotics Division."

The statements allegedly made by Martinez's father were:

- That Martinez's father "told [one of the FBI agents] that approximately two years before the date of September 29, 2009, [Martinez] had come to him asking if [the known drug dealer] could rent out a room from the house for the storing of large amount of cocaine."

- That Martinez's father "stated that [Martinez] had been present on several occasion while cocaine was being broken down while in uniform, but that he was not there for protection or he did not participate."

Hale's intention was to question the two FBI agents regarding these statements in an attempt to impeach Martinez's credibility. The district court sustained an objection as to the admissibility of such evidence, stating that it had already permitted a full cross-examination of Martinez, that it did not believe the statements were admissible either as prior inconsistent statements or statements against interest, and that they were unreliable.

2.

Federal Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." We have held that "[p]roof of such a statement may be elicited by extrinsic evidence only if the witness on cross-examination denies having made the statement."

No. 11–40488

*United States v. Devine*, 934 F.2d 1325, 1344 (5th Cir. 1991); *see also United States v. Leslie*, 759 F.2d 366, 379–80 (5th Cir. 1985).

Hale cannot show that Martinez ever denied making any of the statements Hale wishes to use as extrinsic impeachment evidence. During cross-examination, defense counsel asked Martinez about a number of prior statements he had made and each time Martinez admitted making them. Defense counsel never confronted Martinez with the four specific statements Hale later attempted to use while the FBI agents were on the stand. Moreover, none of the excluded statements were directly inconsistent with anything Martinez said on the stand or admitted to previously saying. Without a denial of making the statements or a showing of inconsistency, such statements cannot be used to impeach a witness's credibility.

There were no constitutional concerns raised by the district court's exclusion of Martinez's several out-of-court statements because Hale had an opportunity to fully cross-examine Martinez about any prior statements he may have made. As extrinsic evidence used for impeachment purposes only, the out-of-court statements made by Hale were properly excluded. We find that the district court did not abuse its discretion when it excluded Martinez's statements as inadmissible hearsay. In any case, excluding the statements would be harmless error due to the overwhelming evidence supporting the jury's verdict. *United States v. Bell*, 367 F.3d 452, 468 (5th Cir. 2004) (noting the court "must be convinced beyond a reasonable doubt that the error was harmless in light of the other evidence presented at trial").

3.

Federal Rule of Evidence 804 provides that statements are not inadmissible hearsay if the declarant is unavailable as a witness where

> a reasonable person in the declarant's position would have made
> [the statement] only if the person believed it to be true because,

No. 11–40488

> when made, it . . . has so great a tendency . . . to expose the declarant to civil or criminal liability [and] is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

FED. R. EVID. 804(b)(3). Hale correctly asserts that Martinez's father (the declarant of two out-of-court statements) was unavailable as a witness—Martinez's father committed suicide in 2009—but he cannot establish either that (i) the statements exposed Martinez's father to criminal liability, or (ii) there are other corroborating circumstances that indicate trustworthiness.

Martinez's father's first out-of-court statement reports that his son had approached him about possibly arranging a room rental in his house for cocaine. This does not, by itself, expose Martinez's father to any criminal liability; rather, it directs any potential criminal liability toward his son and the known drug dealer. Likewise, Martinez's father's second out-of-court statement describes his son's presence at the house in uniform while cocaine is being broken down. This statement also tends to expose his son to potential criminal liability, and does not necessarily expose himself. Even if both statements did tend to implicate Martinez's father in a crime, neither of the statements have "so great a tendency" to do so that make them inherently reliable. *Id.*; *see also Williamson v. United States*, 512 U.S. 594, 600–01 (1994) (finding proximity to self-inculpatory statements does not make non-inculpatory collateral statements admissible); *Bell*, 367 F.3d at 466–67 (finding statements by an accomplice are not presumed trustworthy).

Moreover, there are no corroborating circumstances that clearly indicate the statements' trustworthiness. Martinez's father was likely to become a co-defendant in the conspiracy scheme had he not committed suicide, making his statements that tend to implicate others at least as much as himself less credible and more suspicious than other out-of-court statements. *Williamson*, 512 U.S.

23

No. 11–40488

at 600–01; *Bell*, 367 F.3d at 466–67. And even if we were to find some corroboration in the other evidence (e.g., that Martinez agreed to help his father try to become a cocaine middleman), there is still enough evidence on which the jury could rely to convict Hale that improper exclusion of Martinez's father's two out-of-court statements is harmless error. *Bell*, 367 F.3d 468.

Accordingly, we find that there were no constitutional concerns raised by the district court's exclusion of Martinez's father's out-of-court statements and that it was not an abuse of discretion to exclude such statements as inadmissible hearsay.

C.

Hale contends that the district court plainly erred by not instructing the jury on the substantive crime underlying the conspiracy, actual possession with intent to distribute cocaine. Because Hale did not object to the district court's failure to instruct the jury as to the elements of the substantive crime, we review for plain error. *United States v. Girod*, 646 F.3d 304, 315 (5th Cir. 2011). A plain error is clear or obvious and affects the defendant's substantial rights. *Id.* at 315 n.3. Where we find an error to be plain, we reverse only if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotations omitted).

Hale was charged with conspiracy to possess with intent to distribute more than 5 kilograms of cocaine and the district court instructed the jury in detail on each element of that crime. However, Hale was not charged with the substantive offence underlying the conspiracy—actual possession with intent to distribute more than 5 kilograms of cocaine—because only "sham" cocaine was used during the escorts. The district court did not set forth in detail every element of that crime in the same manner as the conspiracy crime. Instead, the district court instructed the jury:

24

No. 11–40488

You will note that the defendant is charged with conspiracy to commit the crime of possession with intent to distribute a controlled substance, but is not charged with the substantive crime of possession with intent to distribute. Nonetheless, the Court instructs you that to "possess with intent to distribute" means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction. Cocaine is a controlled substance with[in] the meaning of the crime. However, the Government is not required to prove that this crime was actually committed by any person, nor is the Government required to prove that actual cocaine was involved.

Hale's primary contention is that it was error for the district court not to instruct the jury that "actual cocaine" had to be involved with the escorts in order for Hale to be convicted of the conspiracy charge.

It is black letter law that a defendant can be convicted of conspiracy or attempt without also being charged or convicted of the underlying offense. *See United States v. Burke*, 431 F.3d 883, 886 (5th Cir. 2005) (noting in a case where fake drugs were used that "factual impossibility does not preclude a conviction for conspiracy or attempt"). In *United States v. Marino*, we did not find plain error where "the jury instructions, read as a whole, adequately charged the jury as to the definition, character, and nature of the acts" of the substantive crime underlying the conspiracy. 562 F.2d 941, 945 (5th Cir. 1977); *see also United States v. Vaglica*, 720 F.2d 388, 390–91 (5th Cir. 1983) (finding "serious" error but not reversible error where the district court failed to instruct the jury on the substantive offence of the conspiracy crime). Therefore, because the district court's instructions were sufficient to apprise the jury of the definition and character of the substantive crime underlying the conspiracy charge, and because the use of actual cocaine was not necessary to commit the crime of conspiracy, we find that the district court did not commit plain error.

No. 11–40488

## D.

Hale argues that the district court erred when it refused to instruct the jury on his requested affirmative defenses of "public authority" and "entrapment by estoppel." Failure to include a defendant's proposed jury instruction is reviewed for abuse of discretion. *United States v. Simkanin*, 420 F.3d 397, 410 (5th Cir. 2005). We will reverse only if the defendant's requested instructions "(1) [are] substantively correct; (2) [are] not substantially covered in the charge given to the jury; and (3) concern[] an important point in the trial so that the failure to give [them] seriously impairs the defendant's ability to present effectively a particular defense." *United States v. Lucas*, 516 F.3d 316, 324 (5th Cir. 2008). However, even if we find that the district court abused its discretion, "a conviction [can not] be overturned for failure to instruct the jury on a defense unless the requested but omitted instruction has an evidentiary basis in the record which would lead to acquittal." *United States v. Spires*, 79 F.3d 464, 466 (5th Cir. 1996).

### 1.

The public authority defense is available "when the defendant is engaged by a government official to participate or assist in covert activity." *United States v. Sariles*, 645 F.3d 315, 317 (5th Cir. 2011) (quoting *Spires*, 79 F.3d at 466 n.2). "[A] defendant who claims he was acting on behalf of a law enforcement officer may escape culpability only because that officer had the ability to permit the conduct. A defendant may claim that he made a good faith mistake about the scope of the officer's authority because it appeared to him that the officer was sufficiently able to permit his conduct." *Id.*

In order to assert a public authority defense, Hale must show that he reasonably relied on the actual, not apparent, authority of a government official who convinced him to engage in covert activity. *Id.* at 318–19. He cannot do so. The only person who Hale claims ever directly authorized him to engage in

undercover work for the Laredo Police Department was Martinez, who Hale admits was simply a patrol officer like himself who he knew had no actual authority to initiate or approve undercover operations. Even if Hale believed Martinez had some apparent authority as a slightly senior police officer, any reliance on Martinez's authorization could not be reasonable considering Hale's admitted knowledge of the formal undercover procedures followed by the Laredo Police Department, which were not followed in this case.

Because Hale did not establish that Martinez had actual authority to permit him to engage in what he claims to be undercover work, and because any reliance on Martinez's purported authorization would be unreasonable, Hale failed to establish an evidentiary basis upon which to validly submit the public authority defense to the jury. Moreover, none of Hale's proposed jury instructions as to the public authority defense properly set forth the actual authority requirement, making them substantively incorrect. The district court did not abuse its discretion in rejecting Hale's proposed public authority defense.

2.

"The defense of entrapment by estoppel is applicable when a government official or agent actively assures a defendant that certain conduct is legal and the defendant reasonably relies on that advice and continues or initiates the conduct." *Spires*, 79 F.3d at 466. It constitutes a "narrow exception to the general rule that ignorance of the law is no excuse," and the "focus of the inquiry is on the conduct of the government not the intent of the accused." *Id.*

Hale argues that he met his burden to fairly raise the entrapment by estoppel defense and that the district court's refusal to so instruct the jury was reversible error. However, the evidence against Hale precludes application of an entrapment by estoppel defense. To rely on the defense when charged with a federal crime, Hale must be able to show he reasonably relied on the advice of a federal government official or authorized agent of the federal government who

was "empowered to render the claimed erroneous advice." *Id.* at 467. He can do neither. Neither Martinez, who Hale claims recruited him to work with him undercover, nor Sergeant Medina, who Hale claims knew of the undercover work, are authorized *federal* government officials empowered to give advice on federal drug laws. Moreover, any reliance on advice received from Martinez (or second-hand from Sergeant Medina) could not be reasonable where Hale acknowledges that he never spoke to Medina about the purported undercover work, never received specialized undercover training, and he never followed any undercover protocol or completed any formal police reports.

Hale cannot show reasonable reliance on Martinez's purported authorization for him to engage in undercover work, nor can he show that any federal government official ever authorized him to violate federal drug laws. While Hale submitted to the district court several potential versions of the public authority and entrapment by estoppel defenses, none of them correctly stated the law or had the requisite evidentiary basis for it to be submitted to a jury. Accordingly, we find that the district court did not abuse its discretion in rejecting Hale's proposed entrapment-by-estoppel defense.

E.

Hale contends that the district court erred when it refused to enter a judgment of acquittal on the firearms charge (count 2), which required that the government prove beyond a reasonable doubt that Hale (i) used or carried a firearm in relation to a drug trafficking offense or (ii) possessed a firearm in furtherance of a drug trafficking an offense. Because Hale moved for a judgment of acquittal both after the government's case in chief and at the close of the trial, we review a challenge to the sufficiency of the evidence de novo, reviewing the evidence in the light most favorable to the verdict and determining whether any rational jury could have found guilt beyond a reasonable doubt. *United States v. Clayton*, 506 F.3d 405, 412 (5th Cir. 2007).

No. 11–40488

Hale argues that the evidence presented at trial established that his carrying a handgun during the Embassy Suites meeting "played no part" in the crime of conspiracy to commit a drug trafficking offense. He likewise argues that his possession of the handgun at the meeting was not "in furtherance of" the conspiracy because he never "brandished, employed, engaged, or used [the handgun] in any way and [that it] had no effect of changing the results of the meeting." His excuse for taking the handgun into the meeting was that there was no safe place to leave it in the vehicle because the door lock was not working.

Both of Hale's arguments fail. There is sufficient evidence in the record that the jury could have reasonably relied upon showing that Hale committed a drug trafficking crime and that he knowingly carried a firearm during and in relation to that crime. *See United States v. Speer*, 30 F.3d 605, 612 (5th Cir. 1994). Several witnesses testified that Hale took his handgun from the vehicle, cocked it, and carried it tucked in the waistband of his jeans for the duration of the one-hour meeting at the Embassy Suites where the participants agreed to conduct and escort cocaine shipments. This is enough to support a conviction under the first prong of 18 U.S.C. § 924(c). *See id.* at 612 ("Actual possession or use of the firearm is not necessary; it need only have been available to provide protection to the defendant in connection with his engagement in drug trafficking.") (citation and quotation marks omitted).

Moreover, the evidence is also sufficient under the second prong of § 924(c), which requires possession of a firearm "in furtherance" of a drug trafficking offense. *See United States v. Ceballos-Torres*, 218 F.3d 409, 413 & n.4 (5th Cir. 2000) (noting most conduct that satisfies the first prong of 18 U.S.C. § 924(c) also satisfies the second prong). Hale's possession of a handgun displayed prominently in his waistband during the Embassy Suites meeting, and his participation in discussing the idea that he and Martinez would carry their

handguns during the escorts, is sufficient to satisfy the "in furtherance of" requirement. *See id.* at 413–15 (discussing the ways in which possession of a handgun could further a drug trafficking crime). Despite Hale's contentions, there is no requirement that Hale have brandished or actually fired his handgun to be found guilty under§ 924(c), which actions would in fact constitute a separate charge and carry a harsher penalty.

We find that there was sufficient evidence for a jury to conclude beyond a reasonable doubt that Hale either carried a firearm during and in relation to a drug trafficking offense, or he possessed a firearm in furtherance of a drug trafficking offense.

F.

Hale contends that the district court erred in responding to a note from the jury during its deliberations. The note stated:

> In reference to count 1 [conspiracy], can the fact that the defendant knew wether [sic] or not the escort involved real or sham cocaine affect the outcome? I ask because the count clearly states the defendant attempted to distribute a controlled substance, when according to the defendants [sic] testimony and knowledge, there was no controlled substanced [sic] at all.

The court intended to "redirect [the jury] back to the instructions where [it] told them the government is not required to prove that the crime of possession was committed or that there was in fact any controlled substance," and stated in its supplemental instruction (over objection):

> As instructed by the Court, the Government is not required to prove that actual cocaine was involved; it is only required to prove those elements set out in the Court's Instruction. Please consider the Court's Instructions and continue your deliberations.

After further deliberations the jury returned a guilty verdict on the conspiracy count. Hale contends that the district court's response constituted reversible error because, viewed in light of the instructions already given, it did

No. 11–40488

not completely and accurately clear away the confusion and difficulty the jury had over the issue. *See United States v. Carter*, 491 F.2d 625, 633 (5th Cir. 1974).

We assess whether a district court erred in instructing the jury "in light of the entire charge," *United States v. Eargle*, 921 F.2d 56, 57 (5th Cir. 1991), recognizing that district courts enjoy "wide latitude in deciding how to respond to questions from a jury." *United States v. Cantu*, 185 F.3d 298, 305 (5th Cir. 1999). Supplemental instructions must be "reasonably responsive" and "allow[] the jury to understand the issue presented to it." *Id.* (quoting *United States v. Mann*, 161 F.3d 840, 864 (5th Cir. 1998)); *see also Eargle*, 921 F.2d at 58 (finding no reversible error with respect to defendant's contention that a supplemental instruction negated a correct and accurate original instruction).

The district court's original jury instructions were a detailed and correct statement of the law on the charge of conspiracy to possess with intent to distribute more than 5 kilograms of cocaine. They made clear that the jury should not convict Hale unless they found beyond a reasonable doubt that he willfully joined an unlawful agreement to possess with intent to distribute more than 5 kilograms of cocaine. They also made clear that the actual use of cocaine during the escorts was not necessary to convict for conspiracy.

The jury's note shows that, during deliberations, it focused on Hale's testimony that he knew there was no cocaine in the cars he and Martinez were escorting because he had been told they were performing a "dry run." In its response to the note, the district court redirected the jury back to the original instructions which made clear that an agreement to possess and distribute cocaine was sufficient, and that the government did not need to prove that actual cocaine was used in the escorts in order for them to convict Hale of conspiracy. While the response is perhaps not the most artful response one can imagine,[1] it

---

[1] For example, the district court could have said something like: "As stated in the original instructions, in order to convict on count 1, you need to find beyond a reasonable doubt

31

No. 11–40488

is reasonably responsive, correct on the law, and refers the jury back to the more detailed and comprehensive original instructions. The supplemental instructions did nothing to undermine the clarity of the original instructions, and they adequately informed the jury of what the government needed to prove beyond a reasonable doubt in order to convict Hale. *See Eargle*, 921 F.2d at 58 (noting jury instructions "may not be viewed in a vacuum").

We therefore find that the district court did not abuse its discretion when it responded to the jury's note in the manner that it did.

## G.

Finally, Hale contends that the district court erred by enhancing Hale's sentence based on "obstruction of justice" under U.S. SENTENCING GUIDELINES MANUAL (U.S.S.G.) § 3C1.1 (2010), and "abuse of office or use of a special skill" under U.S.S.G. § 3B1.3 (2010). We review a district court's determination that a defendant has obstructed justice and its determination that he abused his position as a police officer for clear error. *United States v. Cisneros*, 112 F.3d 1272, 1279 (5th Cir. 1997); *United States v. Deville*, 278 F.3d 500, 508 (5th Cir. 2002).

### 1.

The Sentencing Guidelines provide for a two level increase to a defendant's offense level in cases where the court finds that the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offence of conviction." U.S.S.G. § 3C1.1. This provision specifically

---

that the defendant willfully entered into an agreement to possess with intent to distribute more than 5 kilograms of cocaine. The government need not prove that the defendant knew whether actual cocaine was used during the performance of the agreement in order to convict of the conspiracy charge."

32

includes denials of guilt under oath that constitute perjury. U.S.S.G. § 3C1.1 cmt. n.2 & n.4 (2010).

At the sentencing hearing, the district court discussed Hale's "overall position that [he] was doing this because he believed it was part of a properly authorized police undercover investigation" and stated that it did not "believe [that argument] under any circumstances." It also noted that Hale "attempted to minimize his training" which showed that he actually knew how undercover operations are normally planned and executed, and that video evidence showed Hale's carefully calculated conduct where he did not leave any fingerprints on the Nextel phone boxes during the Embassy Suites meeting. The district court stated that it did not find Hale "credible for many of the reasons [it had] already touched upon" and that it believed Hale "was not truthful in that respect." It concluded that the "testimony is replete with instances in which [the court thought] Mr. Hale demonstrated that he in fact knew that he was not doing this for a properly authorized police activity."

Although it did not use the term "perjury," the record clearly indicates that the district court at least implicitly found that Hale provided "false testimony concerning a material matter with the willful intent to provide false testimony." *United States v. Como*, 53 F.3d 87, 89 (5th Cir. 1995) (citation omitted). This is sufficient to support an obstruction of justice enhancement. *Id.* (noting that "a separate and clear finding on each element of the alleged perjury, although preferable, is not required").

2.

The Sentencing Guidelines also provide for a two level increase to a defendant's offense level in cases where the court finds that the "defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. In reviewing an abuse-of-trust determination, we determine

whether the defendant occupied a position of trust and whether he abused his position "in a manner that significantly facilitated the commission or concealment of the offense." *United States v. Kay*, 513 F.3d 432, 459 (5th Cir. 2007) (defining "significant facilitation" as "whether the defendant occupied a superior position, relative to all people in a position to commit the offense, as a result of [his] job") (citation omitted).

At sentencing, the district court adopted the presentence investigation report (PSR) which, like the evidence at trial, provided that Hale was a patrol officer working for the Laredo Police Department when he became involved in the cocaine escort scheme. Police officers hold positions of public trust. *See Deville*, 278 F.3d at 508. The PSR and trial evidence also depicted how Hale and his co-conspirators agreed to use police radios to monitor police frequencies in order to detect whether an escort was under surveillance and whether there was a dispatch related to the escorts. This evidence is sufficient to establish that Hale abused his position as a police officer to better facilitate and conceal the cocaine escort conspiracy.

Accordingly, we find that the district court's findings and its application of both of the two level enhancements were not clearly erroneous.

IV.

For the foregoing reasons, we AFFIRM the district court on all issues raised on appeal (except for the Speedy Trial Act waiver issue) and, accordingly, AFFIRM Hale's conviction and sentence.